CHARLES GRATIOT, PLAINTIFF IN ERROR, v. THE UNITED STATES.

The 67th article of the general regulations of the army, published in 1821, recognizes two disbursing officers upon fortifications; namely, the agent of fortifications and the superintending engineer. Where there is no agent, the superintending engineer can be required to perform his duty for a compensation which is fixed by the army regulations. The receipt of a sum of money by the superintending engineer, and custody of it until it could be turned over to the agent, will not justify a charge of two and one half per cent. commission. And in case of such a charge, there is no foundation for a question of usage to be left to the jury.

In this particular case, the charges made by General Gratiot for collecting money (as stated in the sixth, seventh, and eighth items of his account), were already included in his charge for disbursing, contained in the second item, because when disbursing these sums he was acting as agent for fortifications as well as superintending engineer, which duty the department had a right to require him to perform at a fixed compensation, which had already been allowed. The court below were right in refusing to permit evidence in support of these charges to go to the jury, because the only evidence was the transcript, which was not sufficient in law.

The charge of two and one half per cent., as contained in the second item of the account, was unauthorized by law; because it consisted either of charges of commission upon money which had come into his hands for stoppages, or for remittances made to him as disbursing agent, as above described.

The charge of a commission of two and one half per cent. for disbursements other than those on Forts Monroe and Calhoun, as contained in the third item of his account, was a charge for disbursing in the character of superintending engineer, acting also as agent for fortifications, and is not allowed by law.

The charge for extra official services, as contained in the fourteenth item of the account, is the same which this court substantially rejected when this case was formerly under consideration, reported in 15 Peters, except the charge for superintendence relative to the northern boundary of Ohio. Excepting this, the other services were within the ordinary special duties of chief engineer ; and there being

no proof of what these extra official services had been except the account itself, the court below did not err in excluding it from the jury.

The charge for extra official services was against law, because the duties performed necessarily belonged to the office of chief engineer, and if any services were performed beyond the duties of that office, it was necessary that evidence should be introduced to show what had been the chief engineer's personal as well as official agency.

It was the province of the court below to decide, as matter of law, what were the duties of the chief engineer, and to judge whether any evidence had been introduced tending to show that General Gratiot had performed any services not appertaining to his station as chief engineer.

The army regulations under which General Gratiot was removed from West Point to Washington were authorized by law, and his brevet rank did not release him from discharging the duties of his commission proper.

THIS case was brought up by writ of error from the Circuit Court of the United States for the District of Missouri.

It was the same case which was before this court at January term, 1841, which is reported in 15 Peters, 336. Being sent back to the Circuit Court, it came up for trial, after sundry preliminary proceedings which it is not important to state, on the 25th of April, 1843. On the trial, the United States produced and gave in evidence to the jury two transcripts from the books and proceedings of the Treasury Department, which were the same as those produced upon the former trial. The plaintiff also gave in evidence an original account, rendered by the defendant Gratiot to the plaintiff, signed by the defendant, showing a balance in his hands of $35,000 due on account of the appropriation for a fort at Grand Terre, Louisiana.

The plaintiff's case being here closed, the defendant produced his account against the United States, and proved, by a transcript from the books and proceedings of the Treasury Department, that each and every item of his account had been duly presented to the accounting officers of the Treasury Department for allowance against the United States, and had been by the said officers disallowed; which account was in the words and figures following, to wit:—

### Report of Auditor on General Gratiot's Account.

Report of the Third Auditor of the Treasury on the accounts and claims of General Charles Gratiot, late chief engineer, transmitted to him by the Solicitor of the Treasury on the 25th of March, 1841, for the decision of the accounting officers thereon.

No 1. For the safe keeping of and responsibility for the following sums placed in the custody of Charles Gratiot, from the 27th of August up to the 7th and 20th of September, 1821, the dates of their being turned over to James Maurice, as shown on the credit side of the Treasury transcript admitted in evidence in the Circuit Court of Missouri, in the case of The United States v. Charles Gra-

tiot, during the April term of 1840, this during a period of time that he was not a disbursing agent, viz. : —

| | | | | |
|---|---|---|---|---|
| On account of Fort Calhoun, | . | . | . | $ 19,500·00 |
| "        "      Fort Monroe, | . | . | . | 26,550·00 |

| | | | | |
|---|---|---|---|---|
| Making the aggregate sum of | . | . | . | $ 46,050·00 |

Commission on $ 46,050, according to usage in like cases, at 2½ per cent., . . . . . . $ 1,151·25

2. For disbursing, from the 20th of May, 1822, to the 30th of September, 1829, both inclusive, $ 84,325·58, on account of the appropriations for fortifications, other than those on Forts Monroe and Calhoun, for which a separate and distinct accountability was imposed by law, and, according to the decision of the Supreme Court of the United States, as also that of the Secretary of War of the 26th of May, 1831, in the case of Tuttle, constituted a separate agency. Vide opinion of the Supreme Court of 1841, on the subject, and accounts of Tuttle, on file in the Third Auditor's office, by which latter it is shown, that although he (Tuttle) received compensation for the construction or repairs of a fort, he was entitled to, and did receive, an additional compensation for disbursing, *at the same time and place*, the funds for other and distinct appropriations, and that he also received, *at the same time*, a like compensation for disbursing the funds of each separate appropriation for piers at New Castle and Marcus Hook.

Commission on $ 84,325·58, at 2½ per cent., as allowed by general regulations of the army, . . . $ 2,108·14

3. For disbursing $ 30,531·60, on account of the appropriation for the repairs and contingencies of fortifications, from the 1st of November, 1823, to the 30th of September, 1829, both days included, as shown by Treasury transcript referred to above, which disbursements were other than those on Forts Monroe and Calhoun, it having been the usage of the Department to make the like compensation for disbursements under the like circumstances.

Commissions on $ 30,531·60, at 2½ per cent., being less than $ 2 per day, . . . . . . $ 763·29

4. For disbursing $ 591,039 00, on account of the appropriations for Fort Calhoun, from the 13th of November, 1821, to the 30th of September, 1829, both days included, 2,879 days, at $ 2 per day, being less than 2½ per cent., as allowed by general regulations of the army.

Account before rendered, . . . $ 5,758·00

5. For disbursing $ 819,677·64, on account of the appropriations for Fort Monroe, from the 13th of November, 1821, to the 30th of September, 1829, both days included, 2,879 days, at $ 2 per day, as allowed by general regulations of the army.

Account before rendered, . . . $ 5,758·00

6. For collections of money made for the United States from Jacob Lewis & Co., as per accompanying abstract, marked A, which service did not, under the regulations, enter into or form any part of the duties of a " disbursing agent."

Commissions on the sums collected, viz. $24,335·81, at 2½ per cent., according to usage in similar cases, $608·39

7. For ditto, ditto, from Samuel Cooper, as per accompanying abstract, marked B.

Commissions on the same collected, viz. $3,233·62, at 2½ per cent., . . . . . . $80·84

8. For ditto, ditto, for sales of public property, &c., as per accompanying abstract, marked C.

Commissions on sums collected, viz. $16,150·81, at 2½ per cent., . . . . . . . $403·77

9. For 480 barrels cement, account rendered and admitted to his credit in former settlement, . . . . $1,404·00

10. For quarters furnished Lieuts. Dutten and Mordecai, on account of Forts Monroe and Calhoun.

Acccounts heretofore rendered, . . . $40·00

11. For this amount paid to Robert Archer, for medical attendance on persons employed at Forts Monroe and Calhoun.

Accounts before rendered, . . . . $552·00

12. For this amount expended on account of repairs and contingencies of fortifications, $345·59. Account before rendered and passed to the credit of General Gratiot in former settlement.

13. For the following sums withheld by the Treasury officers, viz. : —

Pay and emoluments from the 1st of April, 1836, to the 6th of December, 1838, both days included, . $10,763·99
Allowance for fuel and quarters for same period, . 905·80
Transportation of officers' baggage, . . . 618·67

$12,284·46

14. For certain extra official services, as more fully set forth in the accompanying account marked D, viz. : — for his extra official services in conducting the affairs connected with the civil works of internal improvement carried on by the United States ; and in conducting also the affairs connected with the execution of the act of Congress of July 14, 1832, " to provide for the taking of certain observations preparatary to the adjustment of the northern boundary-line of the State of Ohio," referred to the Engineer bureau for execution by the executive of the United States, and other extra official services connected with the aforesaid items of charge, and which did not constitute any part of his duties as a military officer, but which properly appertained to the duties and functions of civil engineering, and were performed under an understood or implied

contract with the War Department, under the sanction and authority of the President of the United States, to be compensated therefor, over and above my official pay and emoluments, at a reasonable rate of compensation, according to the established usage of the Department in analogous cases, from the 30th of July, 1828, to the 6th of December, 1838, both days included, 10 years and 130 days; at $ 3,600 per annum, that being the pay granted to John S. Sullivan, David Shriver, James Geddes, and Nathan S. Roberts, Esqrs., civil engineers employed under the act of the 30th of April, 1824, entitled an act to procure the necessary surveys, plans, and estimates upon the subject of roads and canals, and less than the extra pay of Captain Andrew Talcott, of the Corps of Engineers, while he was employed under the orders of the Engineer bureau, in executing the act of the 14th of July, 1832, above referred to . . . . . . . $ 37,282.19

15. For certain extra official services, specified in the items of charge contained in accompanying account marked E, none of which services constituted any part or parcel of the duties or services appertaining to the office or functions of any engineer, civil or military, nor of the proper business of civil or military engineering, nor of any of the legal or prescribed duties or functions of my office of chief engineer, or colonel of engineers, nor in any manner included in my official compensation as chief engineer, colonel of engineers, or brigade-general by brevet in the army of the United States ; but all of which services were extra official in relation to each and every of my said official capacities, and were performed under an understood or implied contract with the War Department, under the sanction and authority of the President of the United States, to be compensated therefor over and above my official pay and emoluments at a reasonable rate of compensation, according to the established usage of the Department in analogous cases. For the specification of all which services, I refer to the items in my said account E, all of which I am prepared to show, and prove, were in fact such extra official services, and entitled me, under such understood or implied contract, to such reasonable compensation over and above my official pay and emoluments as aforesaid, viz. : —

*The United States to Charles Gratiot,*     Dr.

Items.

No. 1. For his extra official services at one of the desks or bureaux of the War Department, from the 30th of July, 1828, to the 6th of December, 1838, both days included, 10 years and 130 days, in receiving, acting on, and causing to be filed for safe keeping, in the archives of said desk or bureau, 23,408 letters and other papers (not accounts), 10 years and 130 days.

2. For his entire official services at one of the desks or bureaux of the War Department, from the 30th of July, 1828, to the 6th

Gratiot v. United States.

of December, 1838, both days included, responding to the letters or other communications addressed to, or referred by, the Secretary of War to said desk on business pertaining properly to the administrative branch of the War Department, which responses have in the aggregate filled 10,003 pages of folio-post record, 10 years and 130 days.

3. For ditto, ditto, ditto, during the same period of time as the preceding, in examining and causing to be filed, and preservation of, the returns of property received from the agents acting under the orders of said desk or bureau, say about 100 agents in number on an average, 10 years and 130 days.

4. For ditto, ditto, ditto, during the same period as the preceding, in examining the estimates for funds yearly, quarterly, and monthly, from the disbursing agents in correspondence with said desk or bureau, about 100 agents on an average ; making requisitions on the Secretary of War, for the funds to be remitted to said agents by the Treasury Department ; directing the mode of applying and accounting for the funds so remitted ; keeping the account with the Treasury for such remittances ; examining the vouchers rendered by the said disbursing agents in reference to price and application of the articles and labor paid for, and finally transmitting the said accounts to the Auditor for settlement, 10 years and 130 days.

NOTE. The amount disbursed by said agents, and accounted for to the Treasury during the time specified, was, —

| | |
|---|---|
| For fortifications, | $7,899,571·75 |
| " internal improvement, | 10,242,425·42 |
| " light-houses and beacons, | 91,842·77 |
| " Military Academy, | 344,411·75 |
| " lithographic piers, | 2,057·20 |
| " N. W. executive building, | 3,120·59 |
| " northern boundary of Ohio, | 25,674·63 |
| | $18,609,104·11 |

5. For his extra official services at one of the desks or bureaux of the War Department, from the 30th of July, 1828, to the 6th of December, 1838, both days included, in making weekly reports to the Secretary of War of the proceedings in said bureau in relation to each letter or other paper referred from him, or written by direction of the War Department, 10 years and 130 days, per annum.

6. For ditto, ditto, ditto, in causing all letters and other papers prepared at said desk or bureau to be recorded in books procured for that purpose. Term of service, from the 30th of July, 1828, to the 6th of December, 1838, both days included, 10 years and 130 days.

7. For his extra official services at one of the desks or bureaux of the War Department, from 30th July, 1828, to 6th December, 1838, both days included, in examination and approval, or return to the agent or party to the contract ; for correction or alteration of all contracts appertaining to works to be executed under the direction of the said desk or bureau, and their (the contract) subsequent transmission to the Second Comptroller of the Treasury for file, 10 years and 130 days.

8. For his extra official services at one of the desks or bureaux of the War Department, from 30th July, 1828, to 6th December, 1838, both days included, in examination of, and reporting upon, all doubtful or disputed claims under contracts executed under the supervision of said desk or bureau ; and in making special reports on cases of claims referred to the War Department, by resolution of either branch of national legislature, or in reply to calls from committees, or individual members of Congress, governors of States and Secretary of War, on application made to Secretary of War, or directly to said desk or bureau, or in obedience to legislative enactment.   Of these the following may be cited in part, viz. :

(Then followed a specification, of twenty-two reports made on various subjects.)

9. For his extra official services at one of the desks or bureaux of the War Department, from the 30th July, 1828, to 6th December, 1838, both days included, in causing to be registered, in appropriate books of record procured for the purpose, the letters and all other papers relating to the current business of said desk or bureau ; to accountability generally, and to other matters, &c. — 10 years and 130 days.

10. For his extra official services at one of the desks or bureaux of the War Department, from the 30th July, 1828, to 6th December, 1838, both days included, in making quarter-yearly reports to the proper accounting officer of the Treasury of the agents connected with said desk or bureau who had rendered their accounts, and of those who had failed to do so. — 10 years and 130 days.

11. For his extra official services at one of the desks or bureaux of the War Department, from 30th July, 1828, to 6th December, 1838, both days included, in carrying on the correspondence in relation to the Military Academy, and forwarding to parents and guardians of the cadets circulars, numbering monthly on an average 338 communications, inclusive of the correspondence of the desks or bureaux before charged, item 2. — 10 years and 130 days.

12. For his extra official services at one of the desks or bureaux of the War Department, from 25th November, 1832, to 30th June, 1835, both days included, in causing to be executed, by executive order, the provision of the act of 14th July, 1832, entitled, " An Act to provide for the Taking of certain Observations preparatory

to the Adjustment of the Northern Boundary of the State of Ohio." — 948 days, or 2 years and 218 days.

For all which extra official services, I charge in the aggregate . . . . . . . $ 37,127·42

PETER HAGNER, *Auditor.*

*Treasury Department,*
*Third Auditor's Office, April 5, 1841.*

To ALBION K. PARRIS, Esq.,
Second Comptroller of the Treasury.

*Treasury Department,*
*Second Comptroller's Office, 19 April, 1841.*

I have examined the several claims of General Charles Gratiot against the United States, as particularly set forth and described in the foregoing report, together with all the evidence, and am of opinion that the said claims are not admissible against the Treasury.

ALBION K. PARRIS, *Comptroller.*

The defendant, Gratiot, then gave in evidence sundry depositions, which occupy nearly one hundred pages of the printed record, and of which it is impossible to give any other than a condensed and summary account.

Benjamin Fowler, clerk in the Engineer's Department. He testified that the services mentioned in the above account were rendered by Gratiot; that the office styled the Engineer Department was always considered as a bureau of the Department of War, to which were referred letters, memorials, petitions, and other papers, to be replied to directly from the Engineer Department or reported on to the Secretary of War for his action; that from July 30, 1828, to December 6, 1838, the number of disbursing agents whose accounts passed through, and were examined in conformity to regulations in, said Department was two hundred and five, whose disbursements involved the keeping of three hundred and seventy-nine separate and distinct accounts.

J. G. Swift, who was an officer of the Corps of Engineers from the year 1802 to 1818, and colonel and chief engineer from July, 1812, to November, 1818. He testified, that the usage of the government had been to compensate officers of engineers, over and and above their pay and emoluments, for services, mentioning his own case and two others.

Major William Gibbs McNeill, who was an officer in the army of the United States from 1814 to within the preceding four years, during which last four years he was a civil engineer. He stated, that whilst an officer of the army he received extra compensation when put on extraordinary duty or service; that the services charged in Gratiot's acccount did not belong to the duties of the engineer, either civil or military.

Captain Talcott, who held a commission in the United States
Corps of Engineers from August, 1818, to September, 1836, and in
that interval was advanced from the rank of second lieutenant to that
of captain in said corps.    Afterwards he became a civil engineer.
He stated that he had received from the United States extra allow-
ances for extra services, specifying the cases, and that the services
charged for by Gratiot in his account did not appertain to either mili-
tary or civil engineering.

Thomas L. Smith, Register of the Treasury, who furnished
certified copies of certain accounts in which officers had extra al-
lowances.

Major J. D. Graham, a maior of Topographical Engineers
since August, 1840, and Commissioner for the survey and explora-
tion of the Northeastern Boundary of the United States, stating
the amount of his pay and emoluments.

Colonel Cross, assistant quartermaster-general in the army of
the United States, with the rank of colonel, also stating the amount
of pay which he had received at sundry times.

Colonel Joseph G. Totten, colonel of the Corps of Engineers
and chief engineer.    His deposition contained, amongst other mat-
ters, the following interrogatory and answer, viz.:—

Interrogatory 2.  Examine the records and other documents be-
longing to, and now on file or otherwise in, the Engineer Depart-
ment, and state therefrom, as nearly as you can, what were the affairs
or business committed by executive authority, or otherwise, to the
said Engineer Department, to be ministered and administered by
Charles Gratiot, then the colonel of the Corps of Engineers, and
brigadier-general by brevet in the army of the United States, from
the 30th July, 1828, to the 6th December, 1838, inclusive.

Answer.  It appears from the records of the Engineer Depart-
ment, that the affairs or business committed to the general direction,
supervision, and management of the said Department, during the
period stated in the interrogatory, were the following, namely:—

I.  *Military Engineering.* — Reconnoitring and surveying for
military purposes, with the collection and preservation of topo-
graphical and geographical memoirs and drawings referring to those
objects ; the selection of sites ; the formation of plans and esti-
mates ;  and the construction, repairs, and inspection of fortifications,
constituted affairs and business committed to the general direction,
supervision, and management of the said Engineer Department, and
there appears to have been disbursed for the fulfilment of those
objects, and to have been accounted for to the Treasury Depart-
ment, through the said Engineer Department, during the period the
said Gratiot was chief engineer, about $ 7,537,675.

II.  *Civil Engineering.* — First, reconnoitring and surveying,
&c., under the provisions of the act of the 30th April, 1824, enti-
tled, " An Act to procure the necessary Surveys, Plans, and Esti-

Gratiot v. United States.

mates upon the subject of Roads and Canals," constituted affairs and business committed to the same general direction, supervision, and management ; for the fulfilment of these objects, there appears to have been disbursed and accounted for to the Treasury, through the said Engineer Department, during and for the period stated above, about $67,980.

Second. The superintendence of the execution of the acts of Congress in relation to internal improvements, by roads, canals, the navigation of rivers, and repairs and improvements connected with the harbours of the United States, or the entrance into the same, with the execution of which the War Department was charged, and the inspection of the operations for the execution thereof constituted affairs and business committed to the same general direction, supervision, and management, and for the fulfilment of these objects there appears to have been disbursed and accounted for to the Treasury, through the Engineer Department, during and for the period stated above, about $10,032,870.

Third. Construction of light-houses and beacons constituted affairs and business committed in the same way, and for which objects there appears to have been expended and accounted for to the Treasury, through said Engineer Department, during the period stated in the interrogatory, the sum of about $96,625.

III. *Military Academy.* — During the period stated above, the then colonel of the Corps of Engineers was the inspector of said academy, and was charged, by executive order, with the correspondence relating to it. There appears to have been expended for the support of that institution, and accounted for to the Treasury, through the Engineer Department, and for the same period, the sum of about $323,263.

IV. *Lithographic Press of the War Department.* — This establishment was placed, during the period of its existence, under the control of the Engineer Department; the sum which appears to have been expended in its support, and accounted for to the Treasury Department, through the Engineer Department, amounted to about $2,057.

*Northwest Executive Building.* — The execution of the work " for fitting up the basement rooms of the executive building, occupied by the War Department," was also placed under the direction of the Engineer Department. The amount expended and accounted for to the Treasury, through said department, appears to have amounted to about $3,120.

VI. *Northern Boundary of the State of Ohio.* — The operations in fulfilment of the provisions of the act of the 14th of July, 1832, entitled, " An Act to provide for the Taking of certain Observations preparatory to the Adjustment of the Northern Boundary of the State of Ohio," were under the general direction of this department.

The amount expended in this service, and accounted for to the Treasury, through the Engineer Department, appears to have been about $ 35,474.

VII. *Ministerial and Administrative Duties.* — Receiving, acting on, and causing to be filed in the archives of the Engineer Department, all the letters and other papers, not accounts, thereto referred or received at said department.   Responding to the letters or other communications addressed directly to it, or referred to it by the Secretary of War ; examining and causing to be filed all returns of property transmitted by the subordinate agents ; examining the estimates, yearly, quarterly, and monthly, transmitted by the disbursing agents of the department ; making requisitions on the Secretary of War for the funds to be remitted in fulfilment of said estimates when approved ; directing the mode of applying and accounting for such remittances ; keeping an account with the Secretary for said remittances ; examining the vouchers rendered by said Treasury disbursing agents for settlement through the Engineer Department, and finally transmitting the said accounts to the Auditor of the Treasury for settlement, constituted affairs and business committed to the general direction, supervision, and management of the said Engineer Department.   These disbursements appear to have amounted, during the period stated in the interrogatory, to about $ 18,089,067.   Making for a portion of the time weekly reports to the Secretary of War of the proceedings in said department, in relation to each letter or paper referred to or written by direction of the War Department ; causing all letters and other papers prepared in said department to be duly recorded ; examining and approving, or returning for correction or amendment, contracts for works or supplies required for the prosecution of the operations carried on under the superintendence of the said department, and transmitting said contracts subsequently to the Second Comptroller for file ; examining and reporting upon doubtful or disputed claims on contracts executed under the superintendence of said department ; making, when required, special reports on cases of claims referred to the War Department by resolution of either branch of the national legislature, or in replies to calls from committees, or members of Congress, or Secretary of War, or on applications made to the Secretary of War, or directly to said department ; causing to be recorded the substance of the letters and other papers received at the Engineer Department which related to its current business ; and making quarterly reports, to the proper accounting officer of the Treasury, of such disbursing agents of said department as had rendered their accounts for settlement, and of those who had failed in that particular, constituted affairs and business committed to the same general direction, supervision, and management.

This witness also stated, that in 1838 all the works of internal improvement, with the exception of the Cumberland road, were

transferred to the. Topographical bureau, and furnished a list of sixty-eight works which were thus transferred.

The defendant, Gratiot, also gave in evidence a printed document of Congress, being document number six of the House of Representatives, of the third session of the Twenty-seventh Congress, which it was agreed might be used in all courts in which this cause might be pending, as if spread upon the record.

The defendant, Gratiot, further gave in evidence the depositions of witnesses and documents, spread upon the record of the former case.

James C. Wilson, a clerk in the Engineer Department. He testified that Gratiot performed the services presented in the twelve items of the account.

John C. Spencer, then Secretary of War, who testified that the Engineer Department was a bureau of the War Department, charged with such ministerial and administrative duties as might be assigned to it by the Secretary of War. He also furnished certified copies of the following papers, viz. : —

1. A Regulation dated 10th of August, 1818.

2. A Regulation dated 27th of July, 1821.

3. Letters from the War Department to Colonel McRee and to Major Thayer, allowing them to go to Europe, with extra pay and rations.

4. The decision of President Monroe, allowing brevet pay to General Macomb, the predecessor of General Gratiot.

5. An order of the War Department, fixing the Engineer Department at the seat of government.

6. An order from the War Department, dated April 7, 1818, prescribing the duties of the Engineer Department, and also one dated on the 1st of August, 1828, allowing double rations to each officer of the Corps of Engineers charged with the construction of a fortification, or having a separate command.

Mr. Spencer also stated in his evidence, that he had directed the records and files of the Department of War to be searched for any evidence of any contract, express or implied, that General Gratiot was to receive extra compensation for the services charged by him, and that the proper officers reported that no such evidence was to be found except what might be derived from the papers furnished above, which report he (Spencer) believed to be true. and adopted as his answer to the interrogatory.

William B. Lewis, then Second Auditor of the Treasury, who furnished copies of Gratiot's accounts, with the accounts of other officers of the Engineer Corps who had received extra allowances.

Albion K. Parris, then Second Comptroller of the Treasury, who testified that the number of contracts transmitted from the Engineer Department to the office of the Second Comptroller be-

tween July 30, 1828, and December 6, 1838, amounted to about two thousand eight hundred and thirty.

General Towson, paymaster-general of the army, who testified as to the time when Gratiot received the pay of his brevet rank, and when it was stopped.

Asbury Dickens, Secretary of the Senate, who furnished a copy of a report made by Gratiot to the Secretary of War, upon a claim pending before the Senate.

Many of the witnesses above mentioned were cross-questioned on the part of the United States.

The defendant, Gratiot, further gave in evidence the following printed papers, which, it was agreed, might be used as if spread upon the record, viz.: —

1. Congressional Document No. 78, of the 2d session, 23d Congress.

2. Reports No. 449, 455, 456, 1st session, 23d Congress.

3. Extracts from the Army Regulations revised conformably to the Act of 24th April, 1816. War Office, September, 1816, pages 96, 97, 98.

The defendant, Gratiot, having here closed his evidence, the counsel on the part of the United States gave in evidence to the jury, —

1. The deposition of John C. Calhoun, formerly Secretary of War, who testified that he established what is known as the present bureau system of the War Department, of which the Engineer Department constituted a part ; and that he had no recollection of any intention or expectation, in establishing the bureau system, that the chief of the Corps of Engineers should receive for his services, as the officer in charge of that bureau, any compensation over and above his pay and emoluments as an officer of the army.

2. Colonel J. J. Abert, colonel of the Corps of Topographical Engineers, who testified that he had never received or claimed any extra compensation for official services at one of the desks or bureaux of the War Department, while at the head of said bureau; that he had received extra compensation, but was not, during the time, in the direction of the bureau ; that in his opinion, any duties of an engineer character, assigned by the Regulations, or by direction of the War Department, to either corps of engineers, become the proper and legitimate duties of that corps.

3. Thomas S. Jesup, major-general by brevet, and quartermaster-general of the army, who explained why the colonel of engineers and other officers, stationed at the seat of government, were allowed double rations, and testified that he considered the services charged for in Gratiot's accounts as the legitimate and proper duties of the chief engineer.

4. John H. Eaton, formerly Secretary of War, who testified that he was in office during a part of the time mentioned in Gra-

tiot's accounts, and that no contract or engagement was ever entered into by him with General Gratiot as to the services to be performed by Gratiot.

The evidence being closed on both sides, the following agreement was filed.

*Facts admitted by parties.* — It is admitted by the parties, that the account referred to in the depositions of Colonel J. J. Abert and General Jesup is the same attached to the deposition of Benjamin Fowler.

The United States, by the district attorney, admitted that the defendant should receive credit for the sum of $5,758, being the fifth item of his account, to be deducted from the balance found due from him to the United States on the Treasury transcripts given in evidence ; and also that the sum of $276, being one half of the eleventh item in his account, should, in like manner, be credited to him against the balance on said transcripts.

The defendant withdrew his claim for the fourth, ninth, tenth, twelfth, and thirteenth, and one half of the eleventh items in his account, the same having been allowed him in former settlements.

Whereupon the court instructed the jury, on the part of the United States, as follows: —

*Instructions given.* — 1st. That the defendant is not entitled to any commission on the sums by him turned over to James Maurice, charged by him on account of Fort Calhoun and Fort Monroe, and rejected by the accounting officers of the Treasury; (1.) because defendant received four dollars each day for his attendance upon the above works, by a former allowance, and by the one now ordered ; (2.) because the only evidence is what the transcript introduced by the plaintiff furnishes ; and such evidence is not sufficient to authorize any commission to be allowed merely for turning over to an accounting officer the moneys.

2d. Nor is the defendant entitled to any credit for commissions or disbursements on account of appropriations for fortifications as charged by him. Of this item, the only evidence in the cause is that furnished by the transcript introduced by the United States, as the principal evidence on which the defendant is charged, and the evidence thereby furnished, is not sufficient to authorize the jury to allow the defendant the credit claimed.

3d. Nor is the defendant entitled to commissions for disbursements on account of contingencies and repairs of fortifications as charged by him, there being no evidence on this item of charge except the above-named transcript, which evidence is not sufficient to authorize the jury to allow any credit for this item.

4th. Nor is the defendant entitled to any credit for commissions, as charged, upon any moneys collected of Jacob Lewis & Co.

and Samuel Cooper, or either of them ; because the above-named transcript is the only evidence in the cause to establish this charge against the United States, and such evidence is not sufficient.

5th. Nor is the defendant entitled to commissions as charged by him on account of sales of public property, there being no evidence but the foregoing transcript to establish the charge, which evidence is not sufficient.

In the five cases above, there is *no evidence* to warrant the credit claimed in either case.

6th. The services of the defendant, while chief engineer, charged with the duties of the Engineer Department, in conducting the affairs connected with the *civil works of internal improvement* carried on by the United States, are not extra official services for which he is entitled to credit in this action.

7th. There is no evidence that the defendant performed any extra official service in conducting the affairs connected with the execution of the act of Congress of 14th July, 1832, to provide for the taking of certain observations preparatory to the adjustment of the northern boundary-line of the State of Ohio.

8th. The services alleged to have been performed by the defendant at one of the desks or bureaux of the War Department, the claims to which are specified in an account dated March 23, 1841, and appended to Benjamin Fowler's deposition, taken March 16, 1842, if such services were performed at the bureau of the chief engineer, and professedly in that capacity, they were among the duties appertaining to the office, and such as the defendant was bound to perform as chief engineer, without being entitled to any extra compensation above his pay and emoluments as a brigadier-general in the army of the United States. And as to items numbered from one to twenty-two, in the same account, for examining and reporting on various subjects, for which the defendant claims extra official compensation, his evidence, and the evidence of the United States, show them to have been examinations and reports on matters appertaining to the office of chief engineer. So are the reports on their face, so far as they have been given in evidence, nor is there any evidence in any degree to the contrary. To sustain some of them, no evidence whatever is offered ; neither for making those in regard to which evidence has been offered, nor for such in regard to which no evidence has been offered, can the defendant claim extra compensation.

*Exceptions.*— To the giving of the eight instructions above set forth, and to the giving of each of them, the defendant, by his counsel, excepted.

The defendant, by his counsel, then prayed the court to instruct the jury as follows : —

1. That under the first count of the declaration, the plaintiff is

not entitled to recover against the defendant for any money received by him in any office or capacity other than chief engineer. Which instruction was given by the court.

*Instructions refused.* — 2. That under the second count of the declaration, the plaintiff is not entitled to recover against the defendant for any money received by him in any office or capacity not mentioned in the bill of particulars of demands, furnished and filed by the plaintiff under that count, nor for any money which may have been received by the defendant at any other time than that mentioned in said bill of particulars, that is, the year 1839.

This last instruction was refused by the court, because there was no order made by the court on the plaintiff to furnish a bill of particulars, and on the memorandum furnished voluntarily to the defendant's counsel the court did not act, and might not have acted, if required to do so, under the circumstances, this being a matter of discretion.

3. That if the jury find, from the evidence, that the defendant performed any of the services for which he has charged in the last item of his account under the direction of the President or Secretary of War, and that such services were neither military nor civil engineering, he is entitled to compensation for such services as a set-off in this action. This last instruction was refused by the court.

4. That if the jury find, from the evidence, that the defendant performed any of the services in the item of his account appended to Benjamin Fowler's deposition under the direction of the President or Secretary of War, and that such services were not enjoined by the army regulations, the defendant is entitled to compensation for such services as a set-off in this action.

This last instruction was refused by the court, and the refusal reduced to writing in the following words : —

" This instruction is refused, and the eighth instruction, given on the part of the United States, is referred to as embracing the whole subject-matter. The court is furthermore of opinion, that the President or Secretary could well refer to the chief engineer any matter for report, &c., which appertained to the particular service devolving on the Engineer Department, in cases where Congress, or either House, by law or resolution, required information from the President on that particular subject, aside from any injunction by the army regulations, and therefore the instruction cannot be given in the terms it is asked."

5. That if the jury find, from the evidence, that the defendant, by the direction of the President or of the Secretary of War, performed any of the services charged for in the last item of his account, being the said item attached to Fowler's deposition, and that the services so rendered were out of the limits of his official

duties as chief engineer, he is entitled to compensation for such extra services, as a set-off in this action.

This last instruction was refused by the court, and the refusal was reduced to writing, in the following words : —

" The court refuses this instruction, because the whole evidence in the cause, without any exception, is written evidence, which the court is called on to construe and apply, and not the jury, and from such evidence to ascertain, as matter of law, what were the defendant's duties and acts ; and taking all the evidence, and construing it the most favorably for the defendant, none is adduced showing, or tending to show, the defendant performed any service not appertaining to his station as chief engineer ; and for the proper instruction on the item referred to, the eighth instruction on part of the United States, on this item, is to govern the jury.

" If for no other reason, this instruction would be refused, because the said eighth instruction concludes the whole matter. There is no fact, therefore, to which this instruction could apply, and it again refers the matters of law to the jury, — what the chief engineer's official duties were, — assuming to withdraw their decision from the court, and out of the previous instruction."

To all which decisions and opinions of the court in giving the instructions on the part of the United States, and in refusing the instructions which were prayed for by the defendant, and by the court refused, the defendant, by his counsel, excepts, and prays the court to sign and seal this his bill of exceptions, and that the same be made part of the record, which is done.

J. CATRON.  [L. S.]

To review these instructions and refusals, this writ of error was sued out.

The cause was argued by *Mr. Jones* and *Mr. Coxe*, for the plaintiff in error, and by *Mr. Mason*, Attorney-General, for the United States. There was presented also, by *General Gratiot*, a brief containing detailed references to such of the laws, military regulations, usages of the War Department, &c., as tended to illustrate the two following general heads, viz. : —

1. The history, progressive organization, and proper functions, military and civil, of the engineer corps, and of the chief or colonel of engineers.

2. The effect of the brevet of brigadier-general, when it happens to be conferred on the colonel of engineers, and whenever any of the contingencies happen upon which he takes place according to his brevet commission.

These illustrations were intended to explain the following propositions : —

1. That when General Gratiot was detached from his original station of chief or colonel of engineers at West Point, to take

actual rank and command according to his brevet commission, with the pay and emoluments of a brigadier-general in the army of the United States, he was completely detached from the line of the engineers, and took a distinct station, rank, and command in the line of the army ; indeed, that he could, by no possibility, according to existing laws and regulations, have assumed such station, rank, and command, and been allowed such pay and emoluments, as brigadier-general, without relinquishing, for the time being, his station and command in the line of the engineers, and all the peculiar functions and duties of engineer ; in short, that he was as completely detached from the engineer line as if he had been ordered (and he might just as regularly have been ordered) to take command in the field of a brigade composed of different detachments.

2. That the pay and emoluments received by him, whilst in such command, as brigadier-general, were exclusively appropriated by law to his services in that rank alone, and had no more connection with or reference to any duties or services of engineering, than the like pay and emoluments received by any other officer of the like rank in the line of the army.

3. That, even if General Gratiot, in his then actual rank of brigadier-general, had been liable to be officially called on to perform *engineer* duties or services, still the particular services performed by him, and for which he claimed distinct compensation, as for extra official services, did not, in fact, appertain to the line, business, or science of engineering, in any of its branches.

4. That, even if those services had been (and, in fact, they were not) within the sphere of any branch of *civil* engineering, in which any act of Congress had authorized the employment of the Engineer Corps, still there was no provision in the law to prohibit extra compensation (over and above the stated and official pay and emoluments) to the officers of the engineer corps so employed ; and their title (as by an implied contract) to such compensation has been acknowledged and established by a numerous train of precedents and long usage.

5. But it is thought quite clear, that whilst stationed at the seat of government, in the actual rank and command of brigadier-general, according to his brevet commission, he was not liable to be called on, *ex officio*, for the performance of any of the peculiar duties or services of an engineer, whether military or civil.

*Mr. Jones*, for the plaintiff in error, contended that the instructions given by the court below were erroneous, because they undertook to judge of a fact which was proper for the jury. The circumstance that the evidence was reduced to writing made no difference, and did not authorize the transfer of the question from the jury to the court. All evidence taken under a commission is written, and yet goes, of course, to the jury. Usage is a fact,

and the determination of it cannot be withdrawn from that tribunal which is the exclusive judge of facts.

The claim of General Gratiot was for services rendered beyond the line of his official duty. It is no new principle on his part. If his time and labor have been tasked beyond his office, he is entitled to compensation. This question has been frequently examined by this court, which has decided that there is no necessity for an express contract to establish such a claim. An implied contract is sufficient. The set-off is claimed under the act of 1794. (1 Lit. & Brown's ed. 366.) The claim need not be a legal one ; if it is an equitable one, it is sufficient. The cases which illustrate this are United States v. Macdaniel, 7 Peters, 1 ; United States v. Ripley, 7 Peters, 18 ; United States v. Fillebrown, 7 Peters, 28.

The last mentioned case was analogous to this in some respects. Fillebrown was a clerk, with a fixed salary, and was moreover employed by a board to take charge of their books, at an additional salary of $250 per annum. A part of his set-off was for services prior to his appointment by the board, and this raised the question whether an implied contract was sufficient. This case of Fillebrown is understood to establish the five following propositions, viz. : —

1. That an equitable claim for an unascertained balance, to be fixed by the jury, was admitted.

2. That it was competent to show, by parol evidence, what were the extra services beyond the line of official duty, and that the whole question, whether or not such services were extra, was a fact for the jury, to be established by parol evidence.

3. That parol evidence was admissible to show the measure of compensation for extra services in all officers of the government.

4. That the board had authority to employ a person who rendered the services charged for, and that the law will imply a promise to pay for them.

5. That the Secretary of the Navy could not disallow and annul the right to compensation.

(*Mr. Jones* then explained the account of General Gratiot, as set forth in the preceding statement.)

The situation of General Gratiot may be considered in three points of view.

1. As military engineer, being lieutenant-colonel from 1821.

2. As chief engineer, being full colonel.

3. As a brigadier-general in the army of the United States. When he was detached from the proper head-quarters of the corps, at West Point, he took rank as brigadier-general in the line of the army.

1. As military engineer.

The laws of May 9, 1794 (1 Lit. & Brown's ed. 366), July 16, 1798 (1 ibid. 604), March 3, 1799 (1 ibid. 749), March 16, 1802

(2 ibid. 132), show that the Corps of Engineers was entirely a military corps, and bound to do no other species of duty.

The 63d article of the Rules and Articles of War, established by the act of April 10, 1806 (2 L. & B.'s ed. 359), is as follows : —

" ART. 63. The functions of the engineers being generally confined to the most elevated branch of military science, *they* are not to assume *nor* are they subject to be ordered on *any* duty *beyond* the *line* of their immediate profession, *except* by the special order of the President of the United States ; but they are to receive every mark of respect to which their rank in the army may entitle them respectively."

And this article is quoted in the general regulations for the army issued in 1816. 1821, and 1825.

In the regulations of 1825, there is the following paragraph : —

Par. 888. " The duties of the Engineer Department comprise reconnoitring and surveying for military purposes *and for internal improvements*, together with the collection and preservation of topographical and geographical memoirs and drawings referring to those objects ; the selection of sites ; the formation of plans and estimates ; the construction, repair, and *inspection* of fortifications ; *and the disbursement of the sums appropriated for the fulfilment of those objects, severally, comprising those of the Military Academy.; also, the superintendence of the execution of the acts of Congress in relation to internal improvements, by roads, canals, the navigation of rivers, and the repairs and improvements connected with the harbours of the United States, or the entrance into the same, which may be authorized by acts of Congress, with the execution of which the War Department may be charged."*

What right had the Secretary of War to change the destination of the corps, and divert it from the duties which the law had prescribed as legitimate ?

But, at all events, this regulation does not require their attention to be bestowed upon any other works than those " with which the War Department may be charged." (*Mr. Jones* here referred to such acts of Congress as charged the execution of certain specific works upon the War Department.)

2. As chief engineer, being full colonel.

By the provisions of other enactments, but particularly in those of the last branch of the 27th section of the act of 1802, last of the 63d article of war, and the general regulations of the President under them, the officer of the Corps of Engineers is subject to be ordered upon other duties, which, although not lodged in his office or line profession, are nevertheless, like those named above, governed by the rules and articles of war. They are *staff* services generally, and which by law are designated, when performed by a detached officer, as *extra* official, and always compensated in addition to line pay and emoluments.

*Mr. Jones* then referred to several acts of Congress, to show that where officers were detached for staff duty, they were paid in addition. But the fact that General Gratiot performed staff duties is admitted by the United States in the account.

3. As a brigadier-general in the army.

" The chief of the Corps of Engineers shall be stationed at the seat of government, and shall direct and regulate the duties of the Corps of Engineers, and those also of such of the Topographical Engineers as may be attached to the Engineer Department, and shall also be the inspector of the Military Academy, and be charged with its correspondence." — General Regulations of 1821, p. 165, par. 1 ; or of 1825, p. 167, par. 887.

It is clear that this order or executive regulation detaches the colonel of the Corps of Engineers from the permanent *head-quarters of his corps*, and places him in *position* to command " detachments composed of different corps," viz. : —

1. Corps of Engineers at head-quarters.

2. Officers of the Corps of Engineers on detached service.

3. Topographical Engineers attached to the Engineer Department.

4. Cadets of artillery, cavalry, riflemen, or infantry, attached to the Military Academy by the 3d section of the act of April 29, 1812, " making further provision for the Corps of Engineers " (3 Story, 1241, ch. 72) ; — and.

5. Post of West Point.

*Mr. Jones* then went on to show that by the 61st article of the General Regulations of 1816, and the acts of 1812 and 1818, General Gratiot was entitled to the pay and emoluments of a brigadier-general in the army, as claimed in his account.

*Mr. Mason* (Attorney-General), for the United States.

The history of the case is this.

On the 2d of March, 1819, the plaintiff in error, then an officer of engineers in the army of the United States, was ordered to Old Point Comfort to take charge of the works there building at the two fortifications, Fortress Monroe and Fort Calhoun.

On the 8th of November, 1821, the disbursing agent then at the post was removed, and the plaintiff was directed to take upon himself the disbursements of the public money, agreeably to the regulations for the government of the Engineer Department ; which he did.

On the 1st of August, 1828, he became chief engineer, and removed to Washington, but continued in charge till the 30th of September, 1829. In his final account there rendered, the entire amount of his claims which were disallowed was, for a second per diem and other items, $ 8,958·91.

On the 26th of March, 1833, the plaintiff presented a new account " as agent for fortifications at Forts Monroe and Calhoun."

In this he charged a commission of one per cent. from November, 1821, to September, 1829.

On the 30th of June, 1834, Congress made an appropriation for a " fort at Grand Terre." The whole amount appropriated was drawn from the treasury by General Gratiot, as chief engineer, in November and December, 1835. On the 6th of October, 1836, he repaid into the treasury $ 15,000 thereof, and retained $ 35,000, in addition to a balance of $ 8,958·91 charged against him for disbursements at Old Point Comfort, previously to the 30th of September, 1829.

On the 1st of April, 1836, the pay and allowances of General Gratiot were stopped, and the amount directed to be appropriated to the extinguishment of his debt.

On the 15th of December, 1838, his accounts were again adjusted, and credits allowed him which reduced the balance against him to $ 29,292·13.

As an offset to this balance, General Gratiot, on the 11th of January, 1839, presented a new account at the treasury, in which he renewed his claim for a double per diem, and added a claim for a commission of 2½ per cent. on disbursements made by him of " contingencies for fortifications." And also a claim of 37,262·44 as compensation for extra services in conducting works of civil engineering, from his appointment in 1828 to his dismissal in 1838.

In February, 1839, a suit was brought against him by the United States, in the Circuit Court of Missouri. It was tried in April, 1840, and judgment rendered in favor of the United States for $ 31,056·33.

On a writ of error, this court, at January term, 1841, received that decision, and, deciding several important principles in regard to the items of the set-off, reversed the judgment, on the ground that the defendant's evidence was excluded.

At April term of the Circuit Court of Mississippi, the cause was again tried, and the district attorney admitted the credits which are specified in the statements, and the defendant exhibited a new claim of set-off. The several items are enumerated from 1 to 15. Numbers 4, 9, 10, 12, and 13 were admitted or withdrawn, and the others were insisted. Numbers 1, 2, 3, 6, 7, and 8 arise out of transactions anterior to the plaintiff's becoming chief engineer. No. 14 is substantially the same charge for extra official service which was passed on by this court, 15 Peters, as No. 3, p. 376.

No. 15 is a new demand, claiming $ 37,127·42 for extra official services in the daily and current business of the chief engineer in his intercourse with the War Department, and asserts the principle, that the regulation of 1821, requiring the chief engineer to perform his functions at Washington, detached him from his regular duty, and made all his office business extraordinary service, for

I *

which he demands extra compensation. The details of this item are very minute, and the principle on which the charge is ascertained does not appear ; if allowed, it would have more than liquidated the balance in favor of the government.

In the opinion of the court in the case in 15 Peters, 373, it was deemed right, for the purpose of bringing this protracted controversy within narrower limits, upon the new trial in the Circuit Court, to state some of the views entertained by the court upon points which had been argued as fully as if the evidence had been admitted. And it was held, that by the regulations the plaintiff in error was not entitled to a commission on disbursements, but the per diem was in full of all extra compensation.

That as to a charge for disbursements of contingencies of fortifications, he was at liberty to show it by evidence.

That as to his charge of $ 37,262·46 fcr extra services in conducting the affairs of the civil works of internal improvement of the government, upon its face, this item has no foundation in law, and therefore *that the evidence* which was offered in support of it, if admitted, would not have maintained it, and the ground of this opinion was, that the services alleged to be performed were the ordinary special duties appertaining to the office of chief engineer, on a review of the laws and regulations, &c.

On the new trial, it appeared that, instead of contracting, the subjects of inquiry were enlarged.

But it is submitted, that the principles involved are few and simple, and have been decided by this court.

The court on the trial gave the eighth instruction asked by the counsel of the United States, and overruled the third, fourth, and fifth instructions moved by the counsel of the plaintiff in error. And this opinion of the court involves the important inquiry on which the case turns.

The court instructed the jury, that there was no sufficient evidence to justify them in giving the defendant the credits claimed.

The inquiry was, what were the lawful duties of an officer holding his commission and receiving a salary for his services from the United States. Was this a question for the court or the jury ?

It is submitted, that it was peculiarly a question for the decision of the court. It cannot be determined what was extra official, without previously determining what is the official duty. And this is necessarily a question of law.

It is in the nature of a *quo warranto*, in which the question of the sufficiency of legal authority is always decided by the court.

In the case of Kendall *v.* Stokes, 3 How. 87, it was held that a motion to charge on the proofs was equivalent to a demurrer to the evidence, and such is the practice in Missouri.

In Toland *v.* Sprague, 12 Peters, 300, it was held that where

the evidence was in writing it was not error for the court to charge the jury as to its effect. And the court clearly recognized the same principle in the case of Gratiot v. United States, 15 Peters, 376. The learned judge who delivered the opinion of the court says,— "The court are of opinion that upon its face this item has no just foundation in law, and therefore that the evidence which was offered in support of it, if admitted, *would* not have *maintained* it. The ground of this opinion is, that upon a review of the laws and regulations of the government applicable to the subject, it is apparent that the services therein alleged to be performed were the ordinary special duties appertaining to the office of chief engineer; and such as the defendant was bound to perform as chief engineer, without any extra compensation over and above his salary and emoluments as a brigadier-general of the army of the United States, on account of such services. In this view of the matter, the Circuit Court acted correctly in rejecting the evidence applicable to this item."

Thus having the sanction of this court, the Circuit Court was authorized, on the second trial, in charging the jury that the written evidence adduced was not sufficient to maintain the items of his account of offset.

Since the former hearing of this cause here, the case of Eliason and the United States has been heard and decided. It is reported in 16 Peters, 291 – 302, and the court there held, that by the regulation of March 13, 1835, no extra compensation could be allowed to an officer of the army from the 3d of March of that year. Credit was disallowed to Captain Eliason under circumstances similar to those of the plaintiff in error, and his must share the same fate. Assuming, then, as I have endeavoured to prove, that the Circuit Court did not err in instructing the jury on the sufficiency of the evidence, did the court err as to its opinion of its legal effect?

1. As to the first item, — of two and a half per cent. commissions, for safe keeping of and responsibility for $19,500, from the 27th of August to 7th of September, 1821, and for $26,500, from 27th of August to 20th of September. There is no proof touching this item, except the Treasury transcript. Colonel Gratiot was the commanding officer in charge of the works at Old Point Comfort. Major Maurice was the contractor. These funds were remitted to Colonel Gratiot, and by him paid over to the contractor. There is no law, and there is no proof of usage, to sustain the charge. If he had been subjected to the trouble of disbursing it, as agent, he was entitled to no commission.

2. For disbursing contingents, from 20th of May, 1822, to 30th of September, 1829, &c., there is no additional proof, and he has been allowed a credit of four dollars per diem, which is exclusive of all extra compensation for disbursement.

3. Same answer.

6. For collections of money made of Jacob Lewis & Co., &c.
7.     "     "     "     "     Samuel Cooper.

These were moneys of the United States, paid to the disbursing agent, and carried into his accounts for disbursement. He was no more entitled to commission on these receipts, than on remittances to him from the treasury. Old printed record, p. 14.

8. Major Whiting, under orders, sold public property and paid proceeds to the disbursing agent, who carried them into account to his debit. The same reason applies.

These claims have been presented for the first time since this court decided that the plaintiff in error was not entitled to commission on *disbursements*, with the exception of a part of that for commissions on contingencies. On the former trial, that charge was $836, now it is $2,871·43.

14. This item is substantially the third item on which this court, at the former hearing, passed so emphatic an opinion. In amount it is somewhat larger; but whatever change has been made in the words, the principle is the same.

For services in conducting the affairs connected with the civil works of internal improvement, and in conducting the affairs connected with the execution of the act of Congress of 1824, for taking observations, &c., he claims compensation over and above the pay and emoluments of a brigadier-general, at the rate of $3,600 per annum.

The legal duties of the Engineer Corps were so fully discussed, on the former hearing, that I am unwilling to occupy the time of the court in recapitulating them.

By no act of Congress have these duties been defined. In the act of 1794, 1 L. & B.'s ed. 366, no specific duties are assigned, but places it generally under the orders of the President. By the act of 1802, it was reorganized, " to do such service as the President shall direct." This general power has never been superseded. Every successive act of Congress and of the executive, and, I may add, the silence of the plaintiff in error for a long period that he was in office, show that there was never any just foundation for any such implied contract as must exist to sustain the charge.

The colonel of engineers was bound to perform any military or other duty, not incompatible with the character of an officer and gentleman, that the service may require, and the President direct.

The regulations of 1821 and of 1825 (see 15 Peters, 373, 374) require the chief of the Corps of Engineers to be stationed at Washington, and charges him with the *superintendence* of the Corps of Engineers, to which the Topographical Engineers is attached, and makes his duties comprise reconnoitring and surveying, for military purposes and for internal improvement, with formation of plans and estimates in detail for fortifications, &c.; also the su-

perintendence of the execution of acts of Congress in relation to internal improvements, by roads, canals, the navigation of rivers, and the repairs and improvements connected with the harbours of the United States, with which the War Department may be charged by Congress. And in the case of Eliason v. The United States, 16 Peters, 302, the court hold this language : — " The Secretary of War is the regular constitutional organ for the administration of the military establishment of the nation ; and rules and orders publicly promulged through him must be received as the acts of the executive, and as such be binding on all within the sphere of his legal and constitutional authority." " Such regulations cannot be questioned or defied, because they may be thought unwise or mistaken." To maintain his offset, the plaintiff must establish a contract, express or implied, and the daily established current business of his office, performed without any claim for extra compensation by his predecessor, himself, and his successor, for more than twenty years, it is now argued, was extra official, and that the law implies a contract to pay an extra compensation.

The plaintiff has taken many depositions. They certainly establish no usage in the Engineer Department, nor in any of the bureaux, as they are called, established in the War Department for a more regular and systematic despatch of business. The President had the authority to require the services of the chief engineer at any place, and the regulation of 1821 stationed him at Washington. The nature of his duties of superintendence, and of preparing plans and estimates, in subordination to the Secretary of War, necessarily devolved on him those duties, for which, in his fifteenth item, he has now, for the first time, asserted a claim to the amount of $37,127·42. The items will speak for themselves. On what principle the charge is made, I am unable to comprehend. The position is taken, that when he entered on the duties of the Engineer Department, at Washington, he received the pay of brigadier-general, he ceased to act as colonel of engineers, and was acting only as a brigadier-general of the army of the United States. He held the brevet rank of brigadier-general. Mr. Monroe had allowed to General Macomb, while performing the duties of chief engineer, the pay and emoluments of his brigadier's commission. The reasons for that order are not very favorable to the position now taken. See record.

The brevet pay was allowed because he was performing the duties of the colonel of engineers ; whenever he ceased to perform those duties, his brevet pay ceased with it. In reference to the instances of extra pay allowed, without examining them in detail, I will remark, —

1. That the President had a discretion, by the act of        , to increase rations.

2. That neither the regulation of 1835, nor the law of 1835

. or .of 1838, forbid extra allowances, where an appropriation was
made by Congress for the object.   See the opinion of Mr.
Grundy, in 1839.

3.  That for duties taking the officer from his regular place of
duty, subjecting him to increased expense, allowances have been
made, by express assurance at the time.   See Regulations of 1818,
p. 67, Record.

That abuses have existed is well known ;   they form no basis
on which the court will imply an undertaking to pay an extra com-
pensation.   These abuses produced the proviso of 1835, the act
of 1838, and the stringent and conclusive act of 1842.   None of
the cases which have been decided by this court conflict with the
positions I have taken.   In McDaniel and the United States, and
in Fillebrown and the United States, there were express agree-
ments made by the Secretary of the Navy to pay for services
out of the range of their regular official duties.   In Ripley v. United
States, the services must be without the range of official duties.
And I may, with some confidence, insist, that the court will not
be inclined to relieve the plaintiff in error from the burden which
the law throws on him.   His claim cannot be regarded with favor.
Congress appropriated money for an important national work.   It
went into his hands as a public officer, charged with its application
to that object.   He diverted it to his own uses, on a claim which
was disallowed at the treasury.   Indulgence to such a course of
conduct may defeat military or naval operations of the utmost im-
portance to the country.

*Mr. Coxe*, for the plaintiff in error, in reply and conclusion.

The case ought to be considered as if an action had been
brought by General Gratiot for a settlement of accounts.   The
history of the case given by the Attorney-General might be cor-
rect, but it was not in the record, and he had forgotten to state a
fact in it, which was, that when General Gratiot was dismissed,
there was no ascertained balance against him.  His account had
been for five years before the proper accounting officers of the
government, and was then unsettled.   He asked that a balance
might be struck, but was refused.   It seemed as if in his case the
old practice had been renewed, namely, *castigat audit que*.   Gra-
tiot was required to pay a large sum by a certain day, and, not do-
ing so, the harsh measure of dismissal was resorted to.   Already
$ 20,000 of the claim against him has been  extinguished, and we
hope that more will be by the event of this suit.   The Attorney-
General has represented the danger of large sums being drawn
from the treasury, but we ask for the establishment of no new
principle.  All that we claim is the impartial application of the
same rule which has been extended to others.   And if the appre-
hended danger did exist, is this the tribunal which ought to inter-

pose to prevent it? The answer has been already furnished by the Attorney-General, when he said that the legislature, by interfering, had put a stop to the supposed evil. This must therefore be the last case. The treasury doors are closed by legislative action, not by judicial decision. The Attorney-General has asked, if all the officers who have been brought to Washington by former secretaries are to have extra pay. Whatever may be the consequence, it was not our doing, and we are not responsible. In some of the departments, when boards of commissioners were established, post-captains in the navy were placed there, and received salaries for their administrative functions. They could not be placed on courts-martial, which shows that they were detached from the performance of their regular duties in the service, and yet they have never been obliged to ask for their pay. Since the time when General Gratiot was dismissed, and even now, there are four post-captains at the head of bureaux, entirely detached from military duty. They receive the salaries fixed by law. If this course had been taken formerly, when other officers were placed at the head of bureaux, there would have been no difficulty. If, therefore, the consequences apprehended by the Attorney-General should follow, it will be the government that will cause them, and they cannot be attributed to us. So also, the commander-in-chief of the army has been appointed a commissioner to negotiate with the Indians, and paid with extra compensation. So, also, the quartermaster-general (Jesup) has been sent to Florida in command of an army. These arguments, therefore, ought not to have any effect. This case, like all other cases, is simply a question of legal right.

The Attorney-General has said that the instruction of the court below amounts only to a demurrer to evidence. I am willing to regard it so, as if a motion for nonsuit had been made. But if General Gratiot had been the plaintiff, it was not a proper case for a motion for a nonsuit or a demurrer to evidence, because evidence had been given on both sides. Gratiot's witnesses were all cross-examined by the United States, and the whole evidence was offered which had been thus taken. This is a mere question of law. The amount is of no consequence. "No nation was ever impoverished by liberally rewarding services." If General Gratiot's services were really important, and beyond the line of his official duty, it is no matter what the amount involved may be.

General Gratiot was lieutenant-colonel of engineers when the colonel was promoted, and entitled to a brevet for meritorious services. He received it, bearing a character without exception, and even now there is no imputation on his personal honor and integrity. He was advised that he had rights, and asked no more than the Department had been in the habit of allowing. He presented claims for services beyond his official duty. Were they

so? That is the question which this court has to decide. They were for keeping several hundred accounts, paying money, and other things of an administrative nature. When this case was before the court in 1841, the following language was held, which is found in 15 Peters, 371. "It is true that the act of the 16th of March, 1802," &c., &c. "But however broad this enactment is in its language, it never has been supposed to authorize the President to employ the Corps of Engineers upon any other duty, except such as belongs either to military engineering or to civil engineering. It is apparent, also, from the whole history of the legislation of Congress upon this subject, that, for many years after the enactment, works of internal improvement and mere civil engineering were not, ordinarily, devolved upon the Corps of Engineers. But, assuming the President possessed the fullest power, under this enactment, from time to time to employ any officers of the corps in the business of civil engineering, still it must be obvious, that as their pay and emoluments were, or would be, regulated with reference to their ordinary military and other duties, the power of the President to detach them upon other civil services would not preclude him from contracting to allow such detached officers a proper compensation for any extra services. Such a contract may not only be established by proof of some positive regulation, but may also be inferred from the known practice and usage of the War Department in similar cases, acting in obedience to the presumed orders of the President," &c., &c., &c.

The Attorney-General has said that we must either admit or deny the authority of the "Regulations," and that we are on the horns of a dilemma. But not so. If the President had the power to detach officers for other services than those within the strict line of their duty, it has nothing to do with his power to contract with them for extra compensation for these services. The court said so in the former case, and added, that they had no right to say whether the implied contract was established by evidence or not. Why? Because it was not a question of law, but a question of fact, for the jury. It is true that, at page 376, the court say that one of the charges "has no just foundation in law; and therefore, that the evidence which was offered in support of it, if admitted, would not have maintained it." But this is merely an *obiter dictum*, not a point decided; and it is not easy to see how the two passages can be reconciled with each other. It would seem as if the court thought that civil engineering was a part of the regular duty of the corps. This is an open question. The Attorney-General thinks that we require a reversal of the former opinion of the court. But not so. We only wish that the same rule should be extended to us which has been extended to others. The case of The United States v. Freeman, 3 How. 556, has been referred to as expressing the opinion which we

wish to reverse.    But in that case, double rations were allowed under Regulation 1125, at the discretion of the President, and this was said to be done by him by authority of law ; and this is just the proposition for which we now contend.    It was said on the other side, that the authority of the President does not rest upon acts of Congress.    I take issue upon this proposition. The Constitution says, " Congress shall provide rules for the government of the army and navy."    What right has the President to do it ?    The first act passed was in 1806, the 63d article of which was a prohibition against employing the Corps of Engineers on any other duty, and the same is subsequently repeated.   (*Mr. Coxe* here went into an examination of the laws and army regulations.)

Until 1824, no branch of engineering was taught except military engineering.    Congress has thus exercised its constitutional power, and granted certain restricted powers to the Department.    Whence does the Attorney-General derive an unrestrained power in the President, because he is commander-in-chief ?    It is true that he is so, but his orders, to be legal, must be confined to military duty.    For example, he has no right to command an officer of the army to attend to his (the President's) private business.    There is no authority, either, to order a military man to keep accounts, or attend to administrative duties.    The President has a general superintending power of seeing all laws executed, but that is altogether a distinct and separate head of authority.    This is not in virtue of his being commander-in-chief of the army, but of being President of the United States.    Under this, he can employ agents ;  he may choose anywhere ;  may select civil engineers, or officers of the army proper, to carry on diplomatic arrangements or negotiate with the Indians.    But, then, is not the person so employed to be remunerated for his services ?    He must be, unless some law forbids such pay, and the President has the power to contract that such pay shall be given.    The only claim which the United States had upon General Gratiot was to employ him in civil engineering.    The 67th article of the Regulations of 1825, paragraph 888, confines the services of the corps to such works as were authorized by Congress, and whose execution was charged upon the War Department.    But many works have been attended to, which were neither specifically charged upon the War Department, nor had any natural affinity with it ;  such, for example, as dredging the Mississippi.    The language of the regulation implies that the execution of these works must be charged, by Congress, upon the War Department, at the same time that the appropriation is made.    If this is not the case, then their execution falls under the general power of the President to see the laws executed, and he may employ any body for this purpose. The account which we have before us is for the performance of

such extra official duties. Did they properly belong to the office of an engineer ? (*Mr. Coxe* here referred to the following works to show that they did not : — 1. Dictionnaire de l'Académie Française. 2. Campbell's Military Dictionary. 3. Dobson's Encyclopædia. 4. Encyclopædia Britannica. 5. Brande's Dictionary of Science, Literature, and Art. 6. Rees's Cyclopædia.) We have also the testimony of practical engineers to the same point. We have, in addition, much evidence where officers of all corps have done other duty and been compensated ; and even where Congress has especially charged the execution of works upon the War Department, such as the Cumberland road, officers have been paid extra. General Gratiot was not allowed to give evidence of his services, to establish an express or implied contract. Such evidence was put in, and counter evidence taken, and then the whole ruled out. It is, no doubt, the duty of a court to construe written documents. But if a witness is sick and examined under a commission, does this evidence thereby change its character, and become a written document ? If the decision of the court below is assimilated to a demurrer to evidence, then every fact, and every inference from it, must be taken to be true. For these reasons, we think that the court below erred.

Mr. Justice WAYNE delivered the opinion of the court.

This case is now before us upon exceptions, taken upon its trial in the Circuit Court, to the instructions which were given by the court, and such as it refused to give to the jury. We do not think them well-founded. When the instructions were given and refused, the only matters in controversy were items 1, 2, 3, 6, 7, 8, 14, 15, in General Gratiot's set-off. The 4th, 9th, 10th, 12th items, and one half of the 11th, had been withdrawn, having been allowed in former settlements. The other half of 11, and the entire 5th item, were admitted by the district attorney, in the course of the trial, to be audits against the demand of the United States. The instructions then are to be considered in reference to the disputed items 1, 2, 3, 6, 7, 8, 14, 15.

The first instruction was given upon item number 1, the second upon item 2, the third upon item 3, the fourth upon items 6 and 7, the fifth upon the 8th item, the sixth and seventh upon item 14, and the eighth instruction upon item 15, comprehending under the last all the particulars in the account attached to Mr. Benjamin Fowler's deposition.

The instructions were intended by the court to be legal conclu-clusions from all the evidence in the cause. Our inquiries will be, Are they so ? And, as legal conclusions, were they given in such terms as in no way to encroach upon the province of the jury to weigh the evidence as to the facts in the case ?

The first instruction denies the right to commissions upon the

amount turned over to James Maurice.    After another reason in no way material to be here noticed, the court gives as a final reason for rejecting the charge, that the only evidence in support of it was the transcript; and that such evidence was not sufficient to authorize any commission to be allowed for turning over the money to an accounting officer.

The transcript alluded to is the account of General Gratiot with the United States.    It was a part of the record in the case reported in 15 Peters, 336, and was used again as evidence upon the trial of the cause in the Circuit Court, with the consent of General Gratiot.

We learn from it, that between the 27th August and the 20th September, 1821, $ 46,050 had been remitted to General Gratiot, then a major in the Corps of Engineers and the superintending engineer of fortifications at Old Point Comfort ; and that he, within the dates just mentioned, turned over the money to James Maurice, agent of fortifications, on account of Forts Calhoun and Monroe.    This is the only evidence bearing upon the item.    It is a charge of a commission of 2½ per cent. upon the amount, as it is expressed in the set-off, for safe keeping and the responsibility incurred in receiving and turning it over to the agent, when General Gratiot *was not a disbursing agent.*    It is then established, that the money was received and turned over to Maurice, when he was the agent ; and also what were the relations of General Gratiot and of Maurice to the government at *Old Point Comfort.*    Those relations arose from the 67th article of the General Regulations of the Army, published in orders from the War Department in July, 1821.    From the detail in that article, particularly that paragraph of it directing in what kind of money the agent should make payments, and in what banks it was to be kept by him, there is no doubt it was intended that he should disburse from remittances made to himself by the government.    Such was to be the ordinary nature of remittance.    But by another paragraph, the superintending engineer had a general superintendence of the agents' disbursements, and none could be made without his signature.    And by a third paragraph in the same article, he could be required to perform the duties of agent, when there was no agent of fortifications, for which service a particular compensation is allowed.    Is it not obvious, then, with such a power in the Engineer Department, in the contingency mentioned, to call upon the superintending engineer to perform the duties of agent, that remittances could be made to him to be disbursed by himself, when at the time of the remittance there was no qualified agent to receive it, or to be turned over to an agent when one became qualified.    The exact state of the case in that respect we do not know, — the transcript does not show it ; but it is because it does not show it, and because the money was not disbursed by General Gratiot, but was paid over by him to

the agent in so short a time after it was received, that we are bound to presume there was not an agent at Old Point qualified to receive the remittances made to General Gratiot, and that intermediately, before the money was turned over, the agent who did receive and disburse it became qualified. There were only two officers to whom remittances could be made and by whom they could be disbursed, — the superintending engineer and the agent for fortifications. Such, then, must be the inference, as we have stated it, unless we come to the overstrained conclusion, that the money was remitted to General Gratiot for some other purpose than for disbursement, and that the department was experimenting in a third way, as to the manner of making remittances and of disbursement, contrary to the regulations giving to it the direction of fortifications. The money was clearly sent to be disbursed by General Gratiot, or by an agent. If not for such purpose, it would not have been remitted. But having been remitted to the superintendent of fortifications, and not having been disbursed by him, it could alone have been prevented by the supervention of an agent whose duty it became to do it, the regulation not permitting it to be done by the superintendent, except when there was no agent for fortifications. It is not necessary for us t） go out of this course of reasoning for the purpose of confirming it, but it is confirmed by the manner in which the charge is made. It is " for the safe keeping of and responsibility for the following sums, placed in the custody of C. Gratiot, from the 27th August up to the 7th and 20th September, 1821, the dates of their being turned over to James Maurice, as shown on the credit side of the transcript, &c.; &c., when General Gratiot *was not a disbursing agent*." Why for safe keeping, if at the time the money was remitted James Maurice was a qualified agent to whom the remittance could have been made? Why paid over to him, if between the 27th August and the 7th and 20th September Maurice had not become so? The terms in which the charge is made disclose the fact to have been as we have inferred it was ; and the error in making it has arisen from its having been supposed that the superintending engineer could be the custodium of government money in any other character or purpose than that in which it could be remitted to him by the Engineer Department, under the 67th article of the Army Regulations of 1821. In this view of the claim, no case of compensation by way of usage can apply to it. Here is a case of an officer with certain duties, absolute and contingent, well ascertained, with a fixed and equally well ascertained compensation for any and every service which he could be called on to render. Compensation by way of usage has never been sanctioned by the court in any case, except for extra official service, which was within the equity of the act of 1797, ch. 74, as that act was originally construed and applied in the case of the United States *v.* Wilkins, 6 Wheaton, 135, and subsequently in

the cases of McDaniel, Ripley, and Fillebrown, in 7 Peters, 1, 18, 28. The instance of commissions having been allowed to General J. G. Swift, for money remitted to him and paid over by him to the military agents, certainly does not apply to the case now under consideration. That was done under a very different state of the law and of army regulations, — when there was neither law nor regulation for making an engineer officer a receiving or disbursing agent, when there was no military agent to receive and disburse government funds. We think, then, that the court did not err in instructing the jury, that the only evidence in support of the first item was the transcript, and that such evidence was not sufficient to authorize any commission to be allowed merely for turning over the money to an accounting officer.

The 2d, 6th, 7th, and 8th items in the set-off, and the instructions given upon them, will be considered in connection, because the transcript proves that the 6th, 7th, and 8th items, upon which commissions are a second time charged, though stated for a different service, are parts of the aggregate of $84,325·58 upon which commissions are charged in the 2d item. The charge is a commission of $2\frac{1}{2}$ per cent. upon that amount, for disbursing it " from the 20th May, 1822, to the 30th September, 1829, on account of the appropriations for fortifications other than those on Forts Monroe and Calhoun." The 6th, 7th, and 8th items are for collections of money made for the United States, from Lewis & Co., Samuel Cooper, and for sales of public property. The first observation, which we make here is, that the transcript shows that, within two months at furthest after General Gratiot had paid over the sum mentioned in his first item to Maurice, he had been directed, in addition to his duties as superintending engineer, to perform those also of agent for fortifications, and thus became the disbursing officer of all money applied by the Engineer Department to Forts Calhoun and Monroe. For this agency, a specific compensation is given by the 14th paragraph of the 67th article of Army Regulations, and charged by General Gratiot accordingly, in the 4th and 5th items of the set-off, both of which have been allowed to him ; the 4th in a former settlement, and the 5th having been admitted, as has been already said, by the district attorney, upon the trial of the cause, as a proper credit against the United States. Our second observation is, that the transcript proves that the expenditure of $84,325·58 was disbursed upon the fortifications of which General Gratiot was the superintending engineer and disbursing agent, and not upon *other fortifications*, as might be inferred from the manner in which the charge is made. The whole sum, except $16,150·81, was remitted to General Gratiot on account of the fortification of which he was the superintending engineer and disbursing agent, and that amount was turned over to him by the quartermaster to be reexpended upon Forts Calhoun and Monroe, upon each in propor-

tion to the relation which the sales of public property bore to the sums expended for it out of the specific appropriations made by Congress for those forts distinctively. Or in other words, the property sold had been bought and paid for out of the specific appropriations for each fort, — was resold on account of each of them respectively, — the amount of sales of the property of each fort being kept separately, and were so handed over to General Gratiot to be disbursed again. The transcript shows it was so disbursed. This sum is the amount upon which a commission is charged in the 8th item of the set-off, and which the court said in its fifth instruction could not be allowed, "there being no evidence but the transcript to establish it, which was not sufficient." The transcript also shows that $27,699·43 of the amount of the 2d item in the set-off, denominated in the 6th and 7th items collections from Lewis & Co. and from Cooper, were stoppages out of money remitted to General Gratiot, from payments to be made to those persons, on account of advances which the government had made them on their contracts to supply materials for Forts Calhoun and Monroe. Neither the 6th, nor the 7th, nor the 8th items of the set-off were collections of money by General Gratiot, in the proper sense of that term. The 6th and 7th items were money returned by him out of money remitted to be disbursed by him as agent, and the amount of the 8th item was handed over to him in the same character, and for the same purpose. Thus, the manner in which General Gratiot received more than the half of the 2d item of his set-off, upon which a commission is charged for disbursing and afterwards for receiving, has been shown from the transcript itself. It also shows that the residue of the $84,325·58 were also remittances which had been made to him in his official relation of agent of fortifications. And that the source from which the entire sum was derived was from general appropriations made by Congress for fortifications, which the Engineer Department directed, as it had a right to do, to be applied to Forts Calhoun and Monroe, in addition to the sums expended upon each of them out of specific appropriations which had been made for each. The manner of making appropriations had been general, without particularizing the fortification to which the sum was to be applied, and also appropriations for designated fortifications. A specific appropriation could not be diverted from its object, but general appropriations necessarily implied an application according to the discretion of the department which had the direction of fortifications. A remittance, then, to General Gratiot from a general appropriation, to be applied to the fortifications of which he was superintending engineer and disbursing agent, falls directly within that paragraph of the 67th article by which he was charged with the latter duty. For which, in addition to his pay and other emoluments, he was entitled to receive two dollars a day for each fortification for the construction

of which he disbursed funds, provided his per diem did not exceed two and a half per cent. on the sum expended. That sum, as a per diem, amounting to more than $11,000, has been allowed. From this detailed examination of the transcript (and this 2d item is nowhere besides mentioned in the record), it must be obvious that the court did not err in the second, fourth, or fifth instructions which it gave to the jury, by which the 2d, 6th, 7th, and 8th items of the set-off were disallowed. In making the charge, the opinion given by this court in 15 Peters has been misconceived. The case of Lieutenant Tuttle does not apply. That was disbursing moneys of separate appropriations upon works so distant from each other that the allowance was considered no more than an equitable remuneration for extra official services, which involved personal expenditure in getting to places remote from each other and remote from the locality where he had been detailed for duty.

The third instruction of the court upon the 3d item in the set-off may be briefly disposed of. It will be remembered, that, besides general and specific appropriations for fortifications, Congress made appropriations for the repairs and contingencies of fortifications, and it is for the disbursement of such an appropriation that a commission is charged in the 3d item. It is only necessary to look at the transcript again to see that the remittances which were made to General Gratiot out of the appropriation for repairs and contingencies were to be disbursed by him, and were disbursed by him under that head upon Forts Calhoun and Monroe. We confess our inability to disconnect such incidents from the general duty of the superintending engineer of a fortification, so as to make the service in any way extra official. The disbursement of the money is shown by the transcript, and by the manner in which the charge is made, to have been done in General Gratiot's character of agent of fortifications. In the long list of compensation by way of usage furnished to the court by General Gratiot, we can find no instance of any allowance to an agent of fortifications for paying out such an appropriation, and we will not refrain from saying, if it has ever happened it has been carelessly or inconsiderately made. We think that the court did not err in the instruction which it gave upon this item of the set-off.

The sixth and seventh instructions will now be considered. They relate to the 14th item in the set-off; substantially the same charge which this court has said, in 15 Peters, had no just foundation in law. It differs from it only in phraseology, and from compensation being claimed for services under the act of the 14th of July, 1832, " to provide for taking certain observations preparatory to the adjustment of the northern boundary-line of Ohio." It is not necessary to repeat what the court then said upon this charge. But we must say, further examination into the laws and regulations applicable to the subject has strengthened the opinion that all the services for which

compensation is asked in the 14th item, except that relating to the northern boundary-line of Ohio, were the ordinary special duties appertaining to the office of chief engineer. And with respect to this exception the court did not err in charging the jury that there was no evidence in the cause showing that the defendant had performed any such extra official service. The correctness of every instruction, that there is no evidence to prove a fact, whether such an instruction i asked for or has been voluntarily given by the court, must d pend upon the correctness of the assertion. The court did no say in this case such services might not have been a proper s ject for compensation, but as there was no proof of what they were, none could be given. We think the court did not err eithe in the sixth or seventh instruction.

The eighth general instruction relates to the 15th and last item in the set off, and was referred to by the court as an answer to all of the in tructions which were asked except the first and second. The first was given and the second was rightly refused, not only for the re son given by the court, but because the defendant consented to the introduction of the transcript as evidence, which was a detailed statement of moneys received by General Gratiot before 1839, and could not therefore have been surprised by any item against him or by the proof in support of it. The 8th item is a round charge of $37,127·42 for what are termed extra official services, from the 30th of July, 1828, to the 6th of December, 1838, being the whole time General Gratiot acted as chief of the Corps of Engineers at Washington. It is not necessary and we refrain from making any one of the particulars in this item a subject of remark. General Gratiot came to Washington as chief of the Corps of Engineers, with a bureau already organized, in which, by the regulations of the army, his predecessors had performed every service for which an extra compensation is now asked, except those mentioned in the deposition of Colonel Totten, relating to the direction of the lithographic press, repairs on the northwest executive building, and determining the northern boundary-line of the State of Ohio. The sums expended for those purposes were made under the control of the Engineer Department, and necessarily involved some superintendence by the chief engineer. But supposing it did so, and that such services cannot be included within any of the regulations by which the Engineer Department was organized, or which determines the official duties of the chief engineer, inasmuch as they are not the subjects of a legal charge, it was necessary, before any compensation could be allowed for them under the equity of the act of 1797, ch. 20, that proofs should have been given of what had been the chief engineer's personal as well as official agency in those matters. Merely the amounts expended could afford no rule by which compensation could be graduated. That such services were not liable to be charged for by a commission upon the amounts ex-

pended, or by a per diem allowance, the defendant himself admits by the way in which he has claimed compensation, the largest expenditure being introduced as one of those particulars in his set-off of extra official services, for all of which he made an aggregate charge of $ 37,127·42. But in truth, with the exceptions just spoken of, all of the enumerated services in the 15th item of the set-off called extra official were the proper business of the Engineer Department, to be done by the chief engineer and his assistants in his bureau.

The jury were so instructed by the court.

But it was urged in the argument, that the court used expressions, in refusing to give the fifth instruction, which had the effect to take from the jury the consideration of the evidence. If, however, the language complained of is taken in connection with the sentence of which it forms a part, and the whole is viewed with reference to the instruction as that is expressed, it will be found to be only introductory to a denial by the court of what counsel had assumed in the instruction, that it was the province of the jury to expound the law applicable to the facts. The instruction asked is, if from the evidence the jury found, &c., &c., that the services " rendered were out of the limits of the official duties of the chief engineer, that he was entitled to compensation for such extra services." The court answered, that it was its duty to construe and apply the evidence, to ascertain, as matter of law, what were the defendant's duties, &c., and, taking all the evidence and construing it, &c. ; none is adduced showing or tending to show that the defendant performed any service not appertaining to his station as chief engineer ; and then concludes that the eighth instruction, which it had before given on the 15th item of the set-off, was to govern the jury. In all this we think that the court did not err.

We observe, in conclusion, that there was much ingenious and able argument to maintain General Gratiot's right to claim compensation for extra services by considering the relations which he had borne to the army in three points of view. First as engineer, then as chief engineer, detached from duty at West Point, for service at Washington, and lastly as a brigadier-general in the army of the United States in the line of the army. The whole of the argument, however, was rested upon two misapprehensions. One, that the regulations of the army by which General Gratiot sustained to it the first two relations, and particularly those which had been applied to the second relation, were unauthorized by law. The other misapprehension was, that brevet rank of itself gave a right to additional pay and command, and translated the officer receiving a brevet from the duties of his commission to those of his brevet rank. As to the army regulations, this court has too repeatedly said, that they have the force of law, to make it proper to discuss that point anew, and such of them as were assailed in the case by

counsel, as not warranted by law, the court think are as obligatory as any of the rest. In respect to the promotion of General Gratiot by brevet, it is only necessary for us to say, that it did not release him from any duty or service attached by the regulations and by the usages of the office to his place of chief of the Corps of Engineers at Washington.

We order the judgment of the court below to be affirmed.

Mr. Justice McLEAN dissented.

When the decision in this case was announced, I did not intend to file a written dissent; but as the case is important to the plaintiff in error, beyond the damages recovered, and as the counsel desire the views of all the members of the court on the points ruled, I shall, in a very few words, state the ground of my dissent.

Many depositions were read in this case to show the usage of the government in regard to pay, in the military servic for extra services performed; and also as to what constituted the appropriate duties of the chief of the Engineer Department. A great variety of facts were thus proved, having a direct bearing upon the duties of the plaintiff and the services stated by him as extra, as not appertaining to his office, and for which he claimed a compensation. A number of instances were referred to where pay had been allowed for extra services under the decisions of this court, and a much greater number under the general usage of the government. Among other instructions, General Gratiot's counsel asked the court to instruct the jury, "that if they find from the evidence, that the defendant, by the direction of the President or Secretary at War, performed any of the services charged for in the last item of his account, being the said item attached to Fowler's deposition, and that the services so rendered were out of the limits of his official duties as chief engineer, he is entitled to compensation for such extra services as a set-off in this action."

" The court refused this instruction, because the whole evidence in the cause, without any exception, is written evidence, which the court is called on to construe and apply, and not the jury; and from such evidence to ascertain, as matter of law, what were the defendant's duties and acts; and taking all the evidence and construing it the most favorably for the defendant, none is adduced showing or tending to show the defendant performed any service not appertaining to his duties as chief engineer; and for the proper instruction on the item referred to, the eighth instruction is to govern the jury."

The eighth instruction need not be repeated, as it asserts the same principles contained above, in which the court left nothing for the jury. When this case was before this court, 15 Peters, 371, the court, in referring to the act of 1802, which provided for the organization of the Engineer Corps, cited the 27th section, which de-

clares, "that the said corps when so organized shall be established at West Point, in the State of New York, and shall constitute a military academy; and the engineers, assistant engineers, and cadets of the said corps shall be subject, at all times, to do duty in such places, and on such service, as the President of the United States shall direct." The court observe,—"However broad this enactment is in its language, it never has been supposed to authorize the President to employ the Corps of Engineers upon any other duty, except such as belongs either to military engineering, or to civil engineering." "But assuming the President possessed the fullest power, under this enactment, from time to time to employ any officers of the corps in the business of civil engineering, still it must be obvious, that, as their pay and emoluments were or would be regulated with reference to their ordinary military and other duties, the power of the President to detach them upon other civil services would not preclude him from contracting to allow such detached officers a proper compensation for any extra services. Such a contract may not only be established by proof of some positive regulation, but may also be inferred from the known practice and usage of the War Department."

Gen. J. G. Swift, who was formerly at the head of the Engineer Corps, in his deposition, which was read as evidence, said,—"I have looked over the account hereto attached, amounting to $37,127·42, and am of opinion that the business or functions therein charged do not pertain to the functions of a civil engineer, nor do they pertain to the functions of a military engineer." And he states, that while chief of the Engineer Corps he received additional compensation for extra services.

Major McNeil, a witness, and who is a civil engineer, states, on being requested "to look at the account of Charles Gratiot, hereto annexed or appended, and state whether the services therein charged belong to civil engineering or military engineering, or to either," answered,—"I should say that they would be classed under neither. They do not belong to the duties of the engineer, either civil or military."

Captain Talcott held a commission in the Engineer Corps, from August, 1818, to September, 1836, and he states, that while in the corps for extra services he received extra allowances. And he also says,—"I have examined the account" (of General Gratiot) "appended, and am of opinion that the several items of services charged for do not appertain to either military or civil engineering." And further,—"I do not consider them the appropriate duties of the chief engineer, or of any other engineer."

It is admitted, that so far as the duties of the chief of engineers were regulated by law, or by regulations of the War Department, they may be considered as matter of law for the court, but much parol evidence was heard as to the appropriate duties of that offi-

cer, and to ascertain what part of the services charged for came within such duties. Now these were matters of fact for the jury; and not for the court. The claim was to be allowed or rejected, according to the usage of the department, and that usage, like every other fact not established by judicial decision, is a subject of proof.

The depositions above referred to were only a part of those which were read in evidence. Other witnesses differed with those I have cited, as to some of the material facts stated, and to determine this conflict was the peculiar province of the jury. But the whole evidence was ruled by the court, and not permitted to be weighed by the jury. On this ground, I think the judgment should be reversed.

This ruling is attempted to be sustained by the view of the court in the case in 15 Peters, above cited.

The third item charged by General Gratiot, in the account then relied on, was as follows : — " For extra services, in conducting the affairs connected with the civil works of internal improvement carried on by the United States, and referred to the Engineer Department for execution, and which did not constitute any part of his duties as a military officer, from the 1st day of August, 1828, to the 6th day of December, 1838, inclusive, ten years and one hundred and twenty-eight days, at $ 3,600 per annum, $ 37,262·46." And in their opinion in that case, the court did say, — " As to the 3d item, constituting a charge of $ 37,262·46, for extra services, in conducting the affairs connected with the civil works of internal improvement, very different considerations may apply. The court are of opinion, that this item has no just foundation in law ; and therefore, that the evidence which was offered in support of it, if admitted, would not have maintained it." The reason assigned by the court was, that the services specified came within the official and ordinary duties of the office.

Now, the account rendered at the last trial differed in amount, though the difference is small, from the one charged in the first account, and to which the above remarks of the court are applicable. But there is a much greater difference.

The items of service are specified in the last account, spreading over several pages, instead of the general charge cited. And the depositions which I have referred to, and others not named, were taken in the cause subsequently to the delivery of the above opinion. The facts thus thrown into the case gave it a new aspect. They particularized the service, and showed, by distinguished engineers, what did and what did not belong to the duties of General Gratiot, as chief of engineers.

In the opinion of the court, the service, as generalized in the first account, being connected with internal improvements, came within the general regulations of the War Department, and might, there-

fore, in their opinion, be decided as matter of law. However this may be, I hold that the new and numerous facts proved as to usage and the extra duties of General Gratiot were matters for the jury and not for the court; consequently, that there was error in withholding them from the jury.

In his account, General Gratiot charged the government for the disbursement of upwards of eighteen millions of dollars for " fortifications, internal improvement, light-houses and beacons, Military Academy, lithographic piers, northwest executive buildings, and northern boundary of Ohio."

The transcript containing the above charge was regularly certified by the Treasury Department as having been presented by General Gratiot, and disallowed, " as not admissible against the treasury." That the services charged for were rendered was not disputed.

Benjamin Fowler, a clerk in the Engineer Department, testified, that the services, as charged by General Gratiot, had been performed.

In their second instruction, the court informed the jury that the defendant was not entitled to any credit for commissions on disbursements on account of appropriations for fortifications, as charged by him. Of this item, the only evidence in the cause is that furnished by the transcript introduced by the United States, as the principal evidence on which the defendant is charged, and the evidence thereby furnished, is not sufficient to authorize the jury to allow the defendant the credit claimed. The same instruction was substantially given in regard to disbursements for fortifications, and for other objects, as charged.

Now it would seem that the transcript above stated, certified by the Treasury as containing General Gratiot's account disallowed, proved the services charged were rendered; and they were also proved by Fowler, whose deposition was taken in 1842, since this case was before us on the former writ of error. And whatever part of those disbursements did not appropriately belong to the office of General Gratiot, under the usage of the War Department and the opinion of this court in the former case, would constitute a fair ground for compensation.

Some of the other instructions might be commented on, in reference to the evidence, but I deem it unnecessary to do so, as in my opinion the judgment should be reversed on the grounds already stated.