MEADS et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. July 6, 1897.)

No. 475.

1. OFFICIAL BONDS—RECEIPT OF MONEY BEFORE IT IS DUE.
    The receiver of a land district is liable on his bond for money received by him from entrymen before it was payable under a rule of the interior department, even giving to such a rule the force of an act of congress, since it is directory only, as it merely regulates the time and mode of payment of money which becomes due by virtue of other and independent law.

2. SAME—EFFECT OF DEPARTMENT REGULATIONS.
    While department regulations duly promulgated have the force of law, in a limited sense, they cannot enlarge or restrict the liability of an officer on his bond.

Error to the Circuit Court of the United States for the Western District of Michigan.

Clark & Pearl, for plaintiffs in error.
John Power, U. S. Atty.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

CLARK, District Judge. This suit was brought in the United States circuit court for the Northern division of the Western district of Michigan against the plaintiff in error Thomas D. Meads and the sureties on his official bond as receiver of public moneys at Marquette, Mich., for the land district of Marquette. Meads was appointed receiver for this land district June 5, 1890, and continued in office until March, 1894; and this suit is for the balance of money received by Meads during that term of office, and not paid out or otherwise legally accounted for. The money in question was received from persons proposing to make pre-emption and homestead entries, and the sum consisted in part of the purchase price of the public land, and in part of the fees of receiver and register, and entry fees. It is not necessary for the purpose of the questions here presented to distinguish between the sums paid as purchase price and those paid as fees. Among the various rules and regulations promulgated by the secretary of the interior and the commissioner of the general land office is rule 53, which reads as follows:

"The local officers will thereafter take no further action affecting the disposal of the land in contest until instructed by the commissioner. In all cases, however, where a contest has been brought against an entry or filing on the public lands, and trial has taken place, the entryman may, if he so desires, in accordance with the provisions of the law under which he claims, and the rules of the department, submit final proof, and complete the same, with the exception of the payment of the purchase money or commissions as the case may be. Said final proof will be retained in the local land office, and should the entry finally be adjudged valid, said final proof, if satisfactory, will be accepted upon the payment of the purchase money or commissions, and final certificate will issue, without any further action upon the part of the entryman, except the furnishing of a nonalienation affidavit by the entryman, or, in case of his death, by his legal representatives. In such case, the party making the proof, at the time of submitting the same, will be required to pay the fees for reducing the testimony to writing. All provisions of the rules of practice, inconsistent with the above changes and modifications are hereby rescinded."

It will be observed that this rule is applicable to the case where contest arose in regard to the superior right in relation to the land of a particular entry, and was intended apparently to direct the procedure by the local officers pending such contest, and until its final settlement in the usual and proper way. The argument is that this particular regulation requires just what the previous regulations and their interpretation by the commissioner and the secretary required, and no more, and nothing different. It further appears that, with three or four unimportant exceptions, a contest arose in regard to the proposed entries on which the purchase price and fees were paid to the receiver, which constitute the items of the account now sued on. It is agreed that the sums were paid to the receiver, and the only defense made to the suit is that these payments, under rule 53, were made to the receiver in advance of the time when by that rule they could properly be made, and that the sums were not therefore paid to the receiver in the line of his duty and officially, but were paid to him in violation of rule 53, and that he received them as an individual, and as an agent of the party proposing to make pre-emption or homestead entries, and not as the agent or officer of the government, and that

the money is not therefore, in his hands, public money, for which the sureties on his bond are liable to account, according to the terms of the bond. Omitting the names of the sureties, the entire body of the bond is as follows:

"The condition of the foregoing obligation is such that whereas, the president of the United States has appointed the said Thomas D. Meads to be receiver of public moneys at Marquette, Michigan, by commission dated June 5, 1890, and said Thomas D. Meads has accepted said appointment: now. therefore, if the said Thomas D. Meads shall at all times during his holding and remaining in said office carefully discharge the duties thereof, and faithfully disburse all public moneys, and honestly account. without fraud or delay, for the same. and for all public funds and property which shall or may come into his hands. then the above obligation to be void and of no effect; otherwise to remain in full force and virtue."

The amount sued for was $2,863.56, and the court below directed a verdict in favor of the government, upon which judgment was pronounced, and the case is brought here on writ of error.

Just what is the true intention and effect of the various rules promulgated by the land department upon this subject, as construed by the decisions of that department, has been the subject of much discussion at the bar; but, in the view we take of the case, we are relieved from the task of examining the regulations and decisions in detail with a view to reconcile the apparent conflict in such rules and decisions. As suggested, the contention of the plaintiff in error is that rule 53 determines the right and duty of the receiver, and thereby affects the obligation of the sureties on the official bond, and that the money was not due and payable to the receiver at the time when received, and the sureties are therefore released. This contention presents the question of the true nature and effect of a regulation such as rule 53 on the obligation of the bond, but we merely mention the question now, and will return to it in the further progress of the opinion.

It will be observed that the plaintiff in error assumes that this regulation has all the force and effect of a positive enactment of congress, and it is obvious that the importance thus claimed for the regulation is necessary, in order that the plaintiff in error may make any headway with his contention. Treating rule 53, then, as having all of the effect which the contention thus assumes, we are unable to agree that it follows as a result that the sureties are released from liability on the bond for these sums of money. The bond is executed pursuant to section 2236 of the Revised Statutes. The general provisions as to the time when payments may be made by homestead and pre-emption claimants will be found in sections 2267 and 2301 of the Revised Statutes. It is not suggested in the pleadings or in argument by the plaintiffs in error that the payments were prematurely made to the receiver, except by reason of the limitation contained in rule 53. The general enactments of congress upon the subject expressly provide that such payments shall be made by persons proposing to acquire rights in the public lands, and the manner of disbursing and otherwise accounting for public money so received is provided by general law. The entryman or homesteader, as the case may be, does not make payment of the purchase price or fees required under the au-

thority of rule 53, but under the statutes enacted by congress by which such sums are made due; nor does the receiver pay out or account for such money by authority of any rule or regulation of the department, but by authority of the laws enacted by congress. The assumption that this money becomes due and payable to the receiver by authority of rule 53 is the basis of the defendant's contention, and constitutes a manifest vice in the reasoning and conclusion by which it is sought to make good the defense in this case. Independently of the general law enacted by congress upon the subject, rule 53 would confer no rights and impose no obligations whatever on the receiver or the sureties on his bond. Rule 53 is obviously a regulation which affects only the time and mode of payment, and does not touch the right to make such payment, the obligation to receive it, and to disburse it. These rights and obligations are all fixed by general law. It is to be remembered that the obligors on an official bond of this character should be held to a strict accountability, as was said by the supreme court of the United States in the early case of U. S. v. Prescott, 3 How. 588, and by the supreme court of Tennessee in the well-considered case of McLean v. Tennessee, 8 Heisk. 24. It has often been decided that the laws enacted by congress and in force at the time of the execution of a bond of this character enter into and determine the obligation of the bond, as much as if incorporated by express reference to such law. Treated as equivalent to an act of congress on which the sureties might rely, still rule 53, as before stated, properly construed, could have no such effect as that claimed for it, but merely regulates the time and mode of payment of money which becomes due by virtue of other and independent law, and is in its nature directory only, and would not release the sureties. It is in this respect not different in character from a statutory requirement that officials intrusted with the collection of public revenue shall make quarterly or other fixed settlements, and promptly pay any balance found due upon such settlement. Such requirement being by positive statute, it might be made and has been a contention by the surety that he might rely on a proper enforcement of such statutory regulation, and that failure to require a settlement pursuant to such statute would have the effect to discharge the surety from liability for defaults occurring previously to the time fixed for such stated settlements. In Crawn v. Com., 84 Va. 282, 4 S. E. 721, the supreme court of Virginia said:

"In the case of Com. v. Holmes, 25 Grat. 771. this court held, upon abundant authority, that the regulations prescribed by law for the settlement of such accounts at stated periods, being intended for the benefit of the government, to secure punctuality and promptness in its officers, were directory merely, and did not enter into and form part of the sureties' contract, so as to prevent the legislature from altering or extending the times of settlement at pleasure without the sureties' assent; and therefore, and from the nature of the officers' obligation and duties, and of the condition of the bond, such an extension did not operate as a discharge of the surety. We reaffirm that principle, and are of opinion that the sureties in this case are not discharged from liability for the official acts of their principal by reason of the extension of time for settlement granted to him."

And so in U. S. v. Kirkpatrick, 9 Wheat. 735, Mr. Justice Story, delivering the judgment of the court, said:

"It is said that the laws require that settlements should be made at short and stated periods, and that the sureties have a right to look to this as their security. But these provisions of the law are created by the government for its own security and protection; and to regulate the conduct of its officers. They are merely directory to such officers, and constitute no part of the contract with the surety. The surety may place confidence in the agents of the government, and rely on their fidelity in office; but he has of this the same means of judgment as the government itself, and the latter does not undertake to guaranty such fidelity. No case has been cited at the bar in support of the doctrine, except that of People. v. Jansen, 7 Johns. 332. In respect to that case, it may be observed that it is distinguishable from the present in some of its leading circumstances. But, if it were not, we are not prepared to yield to its authority. It is encountered by other authorities which have been cited at the bar; and the total silence in the English books, in a case of so frequent occurrence, affords strong reason to believe that it never has been supposed that laches would be fatal in the case of the government where it would not affect private persons. Without going more at large into this question, we are of opinion that the mere laches of the public officers constitutes no ground of discharge in the present case."

See, also, U. S. v. Van Zandt, 11 Wheat. 184; U. S. v. Nicholl, 12 Wheat. 505; U. S. v. Boyd, 15 Pet. 187.

These cases proceed upon the distinction between statutes which merely regulate in detail the mode and time of payment and those which determine the right to receive and the duty to pay. The one class of statutory provisions create the duty to pay, with the right to receive, and the duty to disburse; and such provisions are mandatory and essential, and determine the right and obligation, while provisions of the other class are directory, and affect merely the mode of exercising the right and discharging the duty. It was decided in Dollar Sav. Bank v. U. S., 19 Wall. 227, that the provision of law as to the proper mode of assessment and collection of taxes did not affect the right to demand and the duty to pay the taxes imposed by general law, and that an ordinary action of debt would lie to collect such taxes without any assessment whatever. So in King v. U. S., 99 U. S. 229, the collector had received from the treasurer of the Toledo, Wabash & Western Railway Company the sum of $24,923.87, as a tax on interest paid on mortgage bonds of the company. No return had been made to the assessor, sworn to as required by law, and the defense was that this sum was paid to the collector, not upon any return made to the assessor, or any assessment made by him or the commissioner of internal revenue for such taxes, and that it was a voluntary deposit of the money in the hands of the collector at Toledo by the company, and not received by the collector in his official character; that it was not his duty to receive it for the government, under these circumstances; and that his act in receiving the same was unofficial. The point was that Chase, the collector, had no legal authority, as collector of internal revenue, to receive the money. In regard to this defense the court said:

"There can be no question that Chase understood himself as receiving the money for the government, and in payment of the taxes due. Nor is there any question that the treasurer of the railroad company intended it as pay-

ment to Chase in his official character as collector, and supposed he had paid the taxes by so doing; for Chase gave him three separate receipts, in which the taxes for each of the years we have mentioned are set out, and also the months of the year in which they accrued, which he signed officially as collector, and declared in each receipt that it was in full of the account." "The answer,' said the court, 'made to this by counsel, is that the debt was not due, or at least not payable, until the assessor had received and acted on the return made by the corporation. There is nothing in the statute which says this, in terms. If it be sound, it must be an implication, and we do not see how such an implication can arise. That such an assessment was not made long before was owing to the neglect of the company to make proper returns. Did that neglect make the taxes which should have been paid a year before any less a debt from that time? And can it be said they were not due at the time the statute says they should be paid, because the company failed to make the report which it was its duty to make?' If there could be any doubt upon this point, it was set at rest by the decision of this court in Dollar Sav. Bank v. U. S., 19 Wall. 227, where the same objection was taken to a suit to recover this tax. The court held explicitly that the obligation to pay the tax did not depend on an assessment made by any officer whatever, but that, the facts being established on which the tax rested, the law made the assessment, and an action of debt could be maintained to recover it, though no officer had made an assessment. So that, both on principle and authority, we are of opinion that the judgment for the sum received by the collector and not paid over, with interest, is right, and must be affirmed. See, also, U. S. v. Ferrary, 93 U. S. 625."

So in Miller v. Moore, 3 Humph. 189, it was held, on motion against the sheriff, as tax collector, for unpaid taxes, not necessary for the plaintiff to show that the justices had returned proper tax lists as required by law, and that the taxes had been properly assessed as required. The court ruled that it was enough that authority was placed in the sheriff's hands to collect, and that he did in fact collect, the taxes. So in McLean v. Tennessee, 8 Heisk. 22, it was decided upon full consideration that certain sections of the Code of Tennessee which prohibited any officer from receiving or filing a bond not approved in the particular mode pointed out by the statute did not affect the obligation of the sureties on a bond accepted in violation of the statute, and under which the official in fact acted. It was said that these and similar provisions were for the further security of the public, and did not release the sureties, and in the same case it was held that a void levy of taxes which the taxpayers might have resisted was no defense against judgment on the bond for the taxes in fact paid by the people. The opinion proceeded upon the ground that taxes were justly due, and the obligation to pay at a proper time and in proper mode existed, and the fact that these taxes were received by the official without valid levy constituted no defense. So it was held that the failure of the county clerk to keep a revenue docket as required by law did not affect the right of the county to proceed by motion for judgment on the bond. And in Fuller v. Calkins, 22 Iowa, 301, in a suit against the deputy tax collecter of internal revenue, the defense was that the money received was for taxes on incomes not levied, and not due until after the payment of the same to the deputy. This defense was overruled, and it was adjudged that although paid by the taxpayers before due, or before formally levied, yet, being received by the deputy collector as taxes, it came into his hands by virtue of his office, and he

was bound to pay over the same as collector.    The court, in disposing of this case, said:

"The substance of the whole matter, however, is that, though the collector may not have been legally bound to receive this money at the time, yet he did receive it, and, as we are bound to presume, executed the usual and proper receipts, and entered the proper memorandum on the tax list at the time, or so soon as the same was placed in his hands. By so doing he was in no just sense the mere custodian or trustee of the taxpayers, holding the funds for their use, and alone liable to them, or individually to the government, for the faithful application of the funds. This was public money, funds in his hands by virtue of his office, revenue which he was bound to account for and pay over, and by the very terms of the bond the sureties were liable therefor. As was said in Warren. Co. v. Ward, 21 Iowa, 84, the officer was perhaps not bound to take the money, but he did, accepting it as collector, and he is therefore bound for it as money received by virtue of his office."

A tax collector and his sureties are liable for penalties collected, and no question as to the legality of collecting the penalties can be made either by the collector or his sureties.    Wilson v. State, 1 Lea, 317.    It has been repeatedly held that a collector and his sureties on his official bond are liable for taxes collected on a void assessment, and so it is no defense to the collector and his sureties that the law imposing the particular tax collected is unconstitutional.    So held in regard to the dog tax, the statute imposing which was afterwards declared unconstitutional.    Chandler v. State, Id. 296.

Upon the question how far the acts of an officer are to be regarded as official, and to which the liability of the surety on his official bond extends, the ruling in the foregoing cases is strongly supported by analogy in decisions in respect of the liability of officers in the execution of court process.    In Lammon v. Feusier, 111 U. S. 17, 4 Sup. Ct. 286, the marshal, having in his hand a writ of attachment on mesne process against property of Feusier, levied upon the goods of plaintiff in the action, who was a stranger to, and not named in, the process of attachment.    The defense was that, as the writ commanded seizure of the property of the person named, the sheriff, in taking the property of a stranger, was not acting in the line of duty, and the sureties were not liable.    The court, however, said that taking property of a person not named in the writ, or property exempt from attachment, was a breach of official duty, equally with the neglect to take attachable property of the person actually named.    There has, it is true, been much difference of opinion in the courts of the several states upon this question, but, as pointed out in Lammon v. Feusier, the great preponderance of authority is in favor of the proposition that such act is official, and renders the sureties liable.    In that case the supreme court of the United States expressly approved State v. Jennings, 4 Ohio St. 423, and City of Lowell v. Parker, 10 Metc. (Mass.) 309.    In State v. Jennings the court said:

"The reason for this is that the trespass is not the act of a mere individual, but is perpetrated colore officii. If an officer, under color of a fi. fa., seizes property of the debtor that is exempt from execution. no one, I imagine, would deny that he had thereby broken the condition of his bond."

And the court further said:

"True, it may sometimes be more difficult to ascertain the ownership of the goods than to know whether a particular piece of property is exempt from

execution; but this is not always the case, and, if it were, it would not justify us in restricting to litigants the indemnity afforded by the official bond, thus leaving the rest of the community with no other indemnity against official misconduct than the responsibility of the officer might furnish."

In City of Lowell v. Parker, a constable, being authorized by statute to serve only writs of attachment in which the damages were laid at no more than $70, took property upon a writ in which the damages were laid at a much greater sum. The argument was that the constable had no more authority to make the seizure than if he had acted without any writ whatever, but the court overruled this objection, and said:

"He was an officer, had authority to attach goods on mesne process on a suitable writ, professed to have such process, and thereupon took the plaintiff's goods; that is, the goods of Bean, for whose use and benefit this action is brought, and who therefore may be called the plaintiff. He therefore took the goods colore officii, and, though he had no sufficient warrant for taking them, yet he is responsible to third persons, because such taking was a breach of his official duty."

Rule 53, then, regarded as having the effect of a duly-enacted law, would be merely directory as to the time when the official should or should not receive payments of a sum which was being paid, and which he was receiving by virtue of law independently of rule 53; and the rule would not, under any just interpretation, affect the surety's liability on the bond.

Judge Severens, who presided at the trial, stated his view of the question as follows:

"Payment of the price by the entry man is part of the transaction whereby he is to acquire title to the land. Rules prescribed by the department to the local land offices are for convenience in the transaction of business. Such as a rule requiring payment before action on proofs by those officers,—a rule designed to prevent vain proceedings there resulting from a subsequent failure to pay the purchase price. The money may properly be paid at any time while the proceedings for the purpose are in fieri, unless some statute or rule prohibits it, and none such has been shown to me. I have no doubt that if the money were not paid at the time of the application, but, upon notification from the land office that the proofs were held sufficient, it should then be paid, the proceeding would be perfectly valid, and the purchaser would have the right to a title. It is a matter of order only. The receiver is the agent of the government to make the sale. If an intending purchaser of land should, with his proposition to buy, pay the price asked by the owner to the agent of the latter appointed to make the sale, the agent would be accountable to his principal for the money, as between them. If the transaction should fail,—as, for instance, on account of defect in the owner's title,—the principal would be bound to make restitution. The agent would not be liable to the purchaser. It was known that he was acting as agent. He was not selling his own land, nor dealing with a matter of personal concern to himself. There are very cogent reasons for applying this rule of agency to such circumstances as these. My conclusion, therefore, is that, at whatever stage of the proceedings the money is paid by the applicant to the receiver upon his intended purchase, the receiver is bound to render an account thereof to the department. It is not his money. He does not receive it as the agent of the applicant. He has no such dual status. If the money was properly payable at the time of the application, it would make no difference whether the government exacted payment then, or was willing to waive payment until the proceeding should ripen."

With this we fully agree. As was pointed out by the learned circuit judge, the rule of the department does not in terms prohibit pay-

ment at any time, and it is only by implication that such a result is insisted upon.

We may now return to consider for a moment the real character and effect of rule 53 promulgated by an executive department of the general government, and we are very clear that rule 53 was an administrative regulation or order intended to prescribe suitable business methods of doing the work required of officers in the department. In its effect it raises a question of discipline and procedure between the head of the department and the subordinate officers or agents, and, while disobedience of the regulation might furnish sufficient and just ground for discharging an employé, it was not competent by such regulation as this to enlarge or restrict the rights or obligations growing out of the execution of the bond in question as determined by law. The department itself is a mere creature and administrative instrument under laws duly enacted by congress, and would be without power by such regulation to change the liability of the sureties or the rights of the government on a bond like this, executed for the purpose of securing the faithful discharge of trusts imposed by law, and not by this or similar regulations. Official bonds like that here involved are required for the purpose of protecting the public having business relations with the government through officers and agents, and also for the purpose of securing the government against fraud and insolvency on the part of its agents intrusted with collecting and accounting for public revenue; and if it be once conceded that the obligation of such bonds may be changed, and sureties thereby released, by mere department regulations, it is obvious enough that there would be a complete practical failure in the purpose for which such bonds are required and executed, as these department regulations would, in the nature of the case, vary to meet the differing views of heads of departments coming in and going out with changes of administration. In Quinn v. Chapman, 111 U. S. 445, 4 Sup. Ct. 508, it appeared that there was a rule in the land office forbidding the filing of a declaratory statement based upon a pre-emption right subsequent to the commencement of a contest between other parties for the same land, but the court held that the existence of such rule was no valid ground for rejecting a claim which was otherwise legally or equitably good under the general laws of congress. So in Westervelt v. Mohrenstecher, 22 C. C. A. 93, 76 Fed. 119, the action was upon the bond of the cashier of a national bank. The national bank act expressly provided that the cashier of a national bank should hold his office subject to the pleasure of the board of directors. The bank, by a by-law, provided, however, that the cashier should hold his office for one year, and should be elected annually; and the defense made by the sureties on the bond was that the default did not occur during the year for which they were sureties on the bond of the cashier, and that they were liable on the bond for the term of one year only. This contention was overruled, and it was adjudged that the by-laws were nugatory, being in conflict with the laws of congress on that subject, and that it was not competent by a by-law to modify or change the law of congress; that under the law of congress a cashier was appointed and held office subject to removal by the board of directors, and that the term of his

office continued from the time of his appointment until removal and another appointment in accordance with the acts of congress, and the sureties were liable for the entire term. In 20 Op. Atty. Gen. 24, the liability of disbursing agents for public moneys deposited in bank was considered by Judge Taft, then solicitor general. One Hay had been appointed by the secretary of the interior disbursing agent. He was a member and secretary of the board of town-site trustees of Oklahoma territory. The act of congress had expressly provided that the secretary of the interior should provide regulations for the proper execution of the trust; and among the regulations made by the secretary was one which undertook to define the duties of the disbursing agent, and, among other things, provided that he should "deposit all the sums received by him at least once a week, and, when practicable, daily, in some bank designated by the board," and should "pay the same out only on his checks countersigned by the chairman of the board of which he is secretary, which checks, after they are honored, shall be filed with his account as vouchers." The town-site board designated the Commercial Bank of Norman and the Commercial Bank or Guthrie as banks of deposit for the disbursing agent. Sums of money were on deposit in each at the time of their failure, and the question was whether Hay and his sureties on his official bond were liable for any loss arising from the failure of these banks. Discussing this question, the solicitor general said:

"A preliminary objection is made to his liability for the loss of a part of the sums on the ground that it was collected from assessments made and never in the treasury. It was, however, money properly paid into his hands as a special disbursing agent, and was public money while there, because the United States was responsible for its proper disposition, whatever that might ultimately be. His bond expressly bound him to account for all public moneys coming into his hands. The main question is whether the designation of the banks by the board of trustees as places of deposit relieved Hay from the loss. This must be answered in the negative. Hay was a disbursing officer of the United States, and was forbidden by sections 3639, 3620, Rev. St., to deposit the public money in his possession in any other place than with assistant treasurers of the United States, or in some place designated as a depository by the secretary of the treasury. The regulation of the secretary of the interior provided for the designation by the town-site board of a bank for the deposit of moneys in the hands of their secretary and disbursing agent must be construed in the light of the foregoing sections. The power of designation by the board is limited, therefore, to banks which are lawful depositories of public moneys within the statute. It is not claimed that either the Norman bank or the Guthrie bank was such a depository. The result is that Hay is not exonerated from liability on his bond arising from the failure of these banks."

And the view thus expressed was approved by the attorney general. In U. S. v. Symonds, 120 U. S. 49, 7 Sup. Ct. 412, Mr. Justice Harlan, speaking for the court, said:

"The authority of the secretary to issue orders, regulations, and instructions, with the approval of the president, in reference to matters connected with the naval establishment, is subject to the condition, necessarily implied, that they must be consistent with the statutes which have been enacted by congress in reference to the navy. He may, with the approval of the president, establish regulations in execution of, or supplementary to, but not in conflict with, the statutes defining his powers or conferring rights upon others. The contrary has never been held by this court. What we now say is entirely consistent

with Gratiot v. U. S., 4 How. 80, and Ex parte Reed, 100 U. S. 13, upon which the government relies. Referring in the first case to certain army regulations, and in the other to certain navy regulations, which had been approved by congress, the court observed that they had the force of law. See, also, Smith v. Whitney, 116 U. S. 181, 6 Sup. Ct. 570. In neither case, however, was it held that such regulations, when in conflict with the acts of congress, could be upheld."

See, also, U. S. v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764.

It is very true that these regulations duly promulgated by the department have the force of law, in a limited and just sense, especially when authorized or approved by congress. It is to be borne in mind, however, in considering the effect of such orders, that the power, authority, and purpose of the particular departments are well defined by the legislation of congress, and the department is organized for the purpose of giving practical effect in detail to such legislation, and for that purpose the department is vested with power to make all needful rules and regulations within the limits of the authority and purpose thus manifested by congress. In what was thus said it is implied that the general laws of congress with respect to the rights of the public in dealing with these official agencies, as well as the obligations arising out of the execution of these bonds, and the rights of the government thereunder, cannot be changed by mere department regulation. The recognition of such power and of such effect in a department order would, for reasons just indicated, as well as others, be dangerous to the government. There is no claim or suggestion, and, indeed, could not be, upon the record, that the sureties at any time had any knowledge of rule 53, or that anything was done or omitted to be done by them upon the faith of said rule. There is therefore no equitable feature in the position of the sureties by reason of which they should be favored by any nice or doubtful interpretation. Upon what has thus been said, and without further elaboration, it is sufficient to announce that the judgment of the circuit court was, in our opinion, clearly correct, and the same is affirmed.